**CCA ASSOCIATES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 97–334C.**

United States Court of Federal Claims.

Jan. 28, 2010.

Elliot E. Polebaum, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, D.C., for plaintiff. With him on the briefs was Eugene N. Hansen, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, D.C.

Kenneth D. Woodrow, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Brian M. Simkin, Assistant Director, David A. Harrington, Senior Trial Counsel, and Elizabeth A. Speck, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case has a lengthy and somewhat convoluted history. It was originally brought as a breach-of-contract case with a secondary takings claim, *see* Compl. ¶¶ 38–40 (breach of contract), 41–43 (just compensation).[1] That initial focus has been colored by developments in other cases raising similar claims, particularly the *Cienega–Independence Park* chain of decisions. *See Cienega Gardens v. United States*, 194 F.3d 1231 (Fed.Cir.1998) ("*Cienega IV* "); *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir.2001) ("*Cienega VI* "); *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed.Cir. 2003) ("*Cienega VII* "); *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed.Cir.2007) ("*Cienega X* "); *see also Independence Park Apts. v. United States*, 465 F.3d 1308 (Fed. Cir.2006); *Independence Park Apts. v. United States*, 449 F.3d 1235 (Fed.Cir.2006).

Plaintiff, CCA Associates ("CCA"), is a Louisiana partnership that owns an apartment complex in Metairie, Louisiana. CCA claims that the government, in enacting the Emergency Low–Income Housing Preservation Act of 1987, Pub.L. No. 100–242, 101 Stat. 1815, 1877 (1988) ("ELIHPA") (codified at 12 U.S.C. § 1715l note), and the Low–Income Housing Preservation and Resident Homeownership Act of 1990, Pub.L. No. 101–625, 104 Stat. 4079, 4249 ("LIHPRHA") (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. §§ 4101 to 4124), breached its contractual obligations to CCA or alternatively effected a temporary taking of its property without just compensation in contravention of the Fifth Amendment of the United States Constitution. The action was stayed for a number of years to permit the Federal Circuit to clarify the law in pertinent respects by addressing the *Cienega* and *Independence Park* cases. After *Cienega VII* was decided by the Federal Circuit, essentially mandating that a judg-

ment entered for contractual damages be reinstated as a temporary takings award, CCA's case was prepared for and proceeded to trial along the lines outlined in *Cienega VII*. Based upon the resulting evidentiary record, this court ruled that the case was ripe for decision, that the government had taken CCA's property, and that the government must provide just compensation. *CCA Assocs. v. United States*, 75 Fed.Cl. 170 (2007). That decision was rendered after *Cienega VII* but before *Cienega X*. Thereafter, *Cienega X* substantially recast the legal framework explicated in *Cienega VII*. Then, on appeal in *CCA Associates*, the Federal Circuit affirmed the trial court's ruling that the case was ripe for adjudication but vacated the disposition of the takings analysis in light of *Cienega X* and remanded the case for further proceedings. *CCA Assocs. v. United States*, 284 Fed.Appx. 810, 811 (Fed.Cir. 2008). In its remand, the court of appeals provided that "[h]ere, as in *Cienega X*, the Court of Federal Claims 'should allow both sides to supplement the record with additional evidence if they wish to do so.'" *Id.* (quoting *Cienega X*, 503 F.3d at 1291).

Honoring that remand, the court reopened the record and conducted a further trial on both the contract and takings claims, commencing on July 20, 2009. After post-trial briefing, the case is again ready for disposition.

## FACTS[2]

### A. *Housing Program*

During the Depression, Congress passed the National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934), in an effort to encourage private lending for home repairs and home construction. Until the 1960s, the National Housing Act principally subsidized projects of local public housing authorities. Congress amended the National Housing Act in 1961 to "enable private enterprise to par-

---

**1.** The Answer, filed July 14, 1997, sets out a general denial to both counts. Ans. ¶¶ 43–45.

**2.** This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on

questions of mixed fact and law are set out in the analysis. The court also adopts the findings of fact laid out in its prior decision, 75 Fed.Cl. 170, except insofar as they are explicitly superseded by the findings of fact in this decision.

ticipate to the maximum extent in meeting the housing needs of moderate-income families." S.Rep. No. 87–281, at 5 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926; *see* Pub.L. No. 87–70, § 101(a)(2)(a)(6), 75 Stat. 149, 149–50 (1961) ("Section 221(d)(3)"). The Housing Act of 1961 restricted mortgage insurance under Section 221(d)(3) to projects containing five or more units, § 101(a)(12), 75 Stat. at 152 (codified, as amended, at 12 U.S.C. § 1715*l*(f)), but also provided two key incentives for investors: (1) authorization for waivers of mortgage insurance premiums paid to the Federal Housing Administration ("FHA"), a component part of the United States Department of Housing and Urban Development ("HUD"), and (2) loans at below-market interest rates. *See id.* §§ 101(a)(6), (11), (c), 75 Stat. at 150, 152, 153 (codified, as amended, at 12 U.S.C. § 1715*l* (d)(5), (f)); *see* S.Rep. No. 87–281, at 97, *reprinted in* 1961 U.S.C.C.A.N. at 2016.[3] In 1968, Congress added a "Section 236" program, which subsidized owners' monthly mortgage payments and provided mortgage insurance. Housing and Urban Development Act of 1968, Pub.L. No. 90–448, § 201(a), 82 Stat. 476, 498–501 (codified, as amended, at 12 U.S.C. § 1715z–1(a), (j)). The subsidies were coupled with regulatory restrictions requiring participating owners to limit rentals to low- or moderate-income families, restrict rents to a HUD-approved schedule, manage the properties in accord with HUD guidelines, abide by restrictions on the rate of return the owner could receive from the project, and sell the property only upon HUD's approval. *See Cienega Gardens v. United States,* 33 Fed.Cl. 196, 203 (1995) (citing the regulatory agreement executed by the owner and the government in that case), *vacated and remanded by Cienega IV,* 194 F.3d at 1231. Among other things, both the Section 221(d)(3) and Section 236 programs contemplated forty-year mortgages which could be prepaid after twenty years. *See* 24 C.F.R. §§ 221.524(a)(1)(ii), 236.30(a)(ii) (1969) (amended at 34 Fed.Reg. 12,889 (Aug. 8, 1969)). Prepayment removed regulatory restrictions and allowed participation in the conventional housing market.

## B. Chateau Cleary—A Family Partnership

Chateau Cleary Apartments ("Chateau Cleary") is a 104–unit apartment complex in West Metairie, Louisiana, relatively near the city of New Orleans. PX 106 at 17 (Expert Report of Dr. Wade R. Ragas, an economist and real estate expert called to testify by CCA (May 30, 2005)) ("Second Ragas Report"); DX 140 at 13–15 (Management Plan of Chateau Cleary Apartments by Mr. Jim Alexander (May 31, 1997)) ("Alexander Report").[4]

On October 6, 1969, Ernest B. Norman, Jr. and J. Robert Norman (the "Norman brothers") purchased from New Orleans investors

---

**3.** The Housing Act of 1961 did not authorize the FHA itself to make loans with below-market interest rates, but it effectively guaranteed those rates by granting the Federal National Mortgage Association ("Fannie Mae") the power to purchase mortgages insured under the Section 221(d)(3) program. § 101(c), 75 Stat. at 153. As the House report accompanying the 1961 Act explained: "The essence of the new proposal is to provide long-term loans at a very low interest rate, using the FHA insurance machinery and providing the necessary funds through the resources of the special assistance programs of [Fannie Mae]." H.R.Rep. No. 87–447, at 11 (1961); *see also* S.Rep. No. 87–281, at 8, *reprinted in* 1961 U.S.C.C.A.N. at 1930 ("The [Section 221(d)(3)] mortgage loans could be purchased from the lender under the special assistance program of [Fannie Mae]."). In practice, only Fannie Mae purchased these loans, so the Section 221(d)(3) program "amount[ed] to a[] [Fannie Mae] loan to FHA-approved cooperative projects." Edward P. Scott, Note, *The Cooperative*

*Apartment in Government–Assisted Low–Middle Income Housing,* 111 U. Pa. L.Rev. 638, 650 (1963); *see also* Nathaniel S. Keith, *An Assessment of National Housing Needs,* 32 Law & Contemp. Probs. 209, 214 (1967) (Under the Section 221(d)(3) program, "the permanent mortgage is purchased by [Fannie Mae]."). *See, e.g.,* PX 33 at 3 (Transfer and Contribution to Partnership from Ernest B. Norman, Jr. to CCA (Dec. 31, 1985)) (indicating that CCA's original mortgagee, Pringle–Associated Mortgage Corporation, had sold the mortgage to the Government National Mortgage Association ("Ginnie Mae"), a successor to the original Fannie Mae); *see also* 12 U.S.C. § 1717(a), (b)(1) (providing that the original Fannie Mae was split into Fannie Mae and Ginnie Mae, both of which have statutory authority to purchase mortgages insured under Section 221(d)(3)).

**4.** "PX___" denotes plaintiff's exhibits; correspondingly, "DX___" refers to defendant's exhibits.

the land on which to build Chateau Cleary, as well as the plans that the selling investors had developed for the complex. 2006 Tr. 53:24 to 54:8, 55:12–15 (Test. of Ernest B. Norman, III, the managing partner of CCA);[5] PX 1 (Cash Sale of Property, signed by the Norman brothers and Patrick J. Tomeny, Anthony D. Lewis, and Paul Atwood (Oct. 6, 1969)). In conjunction with the sale, the Norman brothers entered into the Section 221(d)(3) program. On November 7, 1969, they contemporaneously signed three documentary instruments—a secured note, a regulatory agreement, and a mortgage—in a conference room at HUD's offices in New Orleans. 2009 Tr. 33: 10 to 35:16 (Norman). Each document was drafted by HUD. *Id.* The secured note was set out on HUD Form 1734 and was in the amount of $1,601,100.00. PX 3 (1969 Note). It was endorsed by HUD and incorporated the mortgage by reference. *Id.* The secured note prohibited the mortgagor from prepaying the mortgage without prior written approval of the Federal Housing Commissioner, except that no prior approval was necessary after 20 years. *Id.*[6] The mortgage, signed by the Norman brothers and Pringle–Associated Mortgage Corporation, was written on FHA Form 4123–D and incorporated by reference the terms of the secured note and the regulatory agreement. PX 4 at first undesignated paragraph, ¶ 3 (1969 Mortgage). The regulatory agreement, written on FHA Form 1730 and entitled "Regulatory Agreement for Limited Distribution Mortgagor Projects Under Section 221(d)(3) of the National Housing Act, As Amended," was signed by the Norman brothers and HUD. PX 2 (1969 Regulatory Agreement). Under the regulatory agreement, in exchange for HUD's action to provide mortgage insurance, endorse the secured note, and agree to the transfer of the mortgaged property, the Norman brothers agreed to charge HUD-approved rents to HUD-approved tenants for "so long as the contract of mortgage insurance continues in effect." *See id.* at second undesignated paragraph, ¶¶ 4(b), 5(c). The regulatory agreement also incorporated by reference the mandates of Section 221(d)(3) and the implementing regulations, which included the mortgagors' right to prepay their mortgages after 20 years. *See id.* at second undesignated paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1969).[7]

On March 27, 1985, Ernest B. Norman, Jr. formed the CCA Associates partnership, with the partners consisting of his children, a trust for his grandchildren, and himself. PX 30 (CCA Articles of Partnership). On April 2, 1985, with HUD's approval, J. Robert Norman sold his fifty percent interest in Chateau Cleary to CCA for $677,550. PX 28A (Act of Sale conveying J. Robert Norman's interest in Chateau Cleary to CCA) (Apr. 2, 1985). CCA also assumed the Chateau Cleary mortgage. PX 28 (Assumption Agreement between Ginnie Mae and CCA (Apr. 2, 1985)). As a consequence, HUD also required CCA to sign a new regulatory agreement for Chateau Cleary. PX 29 (Regulatory Agreement, signed by HUD and Ernest B. Norman, III,

---

5. References to the transcript of the trial conducted in September 2006 will be to "2006 Tr.___." References to the transcript of the further trial conducted in July 2009 will be to "2009 Tr.___." The identity of the testifying witness will be set out in parentheses following a citation to the evidentiary transcript.

6. The provision in the note guaranteeing the Norman brothers' right to prepay after 20 years stated:

> The debt evidenced by this note may not be prepaid either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner except a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement of this note by the Federal Housing Commissioner.

PX 3 (1969 Note).

7. Due to an increase in labor costs in the New Orleans area from late 1969 to mid–1971, the Norman brothers requested and HUD approved an increase in the mortgage amount. As a result, on May 17, 1971, the Norman brothers signed on HUD forms a second secured note for $1,699,500.00 and a second mortgage. PX 5 (1971 Note); PX 6 (1971 Mortgage). The new note explicitly referred to the prepayment right and incorporated by reference Section 221(d)(3) and HUD's implementing regulations. PX 5 (1971 Note); 24 C.F.R. § 221.524(a)(1)(ii) (1971). The new mortgage incorporated by reference the 1971 note and the original 1969 regulatory agreement. PX 6 at first undesignated paragraph, ¶ 3 (1971 Mortgage).

acting on behalf of CCA (Apr. 26, 1985)) ("1985 Regulatory Agreement"). The 1985 Regulatory Agreement mirrored that executed in 1969, *see generally id.;* PX 2 (1969 Regulatory Agreement), including the HUD restrictions related to tenants and rent, PX 29 at ¶ 4 (1985 Regulatory Agreement), and incorporating by reference the mandates of Section 221(d)(3) and the associated regulations, which continued to include the right to prepay the mortgage after 20 years. *Id.* at second undesignated paragraph; 24 C.F.R. § 221.524(a)(1)(ii) (1985); 2006 Tr. 172:2 to 173:10 (Norman). Eight months later, on December 31, 1985, Ernest B. Norman, Jr. transferred his one-half interest in Chateau Cleary to CCA, giving CCA full ownership of the property. PX 33 (Transfer and Contribution to Partnership from Ernest B. Norman, Jr. to CCA (Dec. 31, 1985)).

### C. Emergency Low–Income Housing Preservation Act of 1987

In the mid–1980s, Congress became concerned that owners of housing insured under Section 221(d)(3) would begin to exercise their prepayment rights, thereby reducing the total number of low-income housing units. H.R.Rep. No. 100–122(I), at 35 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3351. In consequence, Congress enacted ELIHPA, § 202(a)(1), 101 Stat. at 1877 (codified at 12 U.S.C. § 1715l note), which took effect on February 5, 1998 and "placed a two-year moratorium on mortgage prepayments to allow Congress time to devise a permanent solution to the possible shortage of low-income housing." *See Cienega IV,* 194 F.3d at 1235. ELIHPA did not foreclose prepayment of Section 221(d)(3) mortgages altogether, but required mortgagors to obtain HUD approval prior to prepayment, even if the twenty-year period had already elapsed. ELIHPA § 221(a), 101 Stat. at 1878–79; 24 C.F.R. § 221.524(a)(1)(ii) (1971). ELIHPA also contained provisions allowing owners to seek several incentives from HUD for ex-

tending the use their housing units for low-income tenants, including an increase in the allowable annual distribution, alteration of the method of calculating an owner's equity in the property, an increase in the owner's access to accounts it maintained for residual receipts and replacements,[8] and insurance for a second mortgage. ELIHPA § 224(b)(1)-(4), (7), 101 Stat. at 1880. In September 1990, HUD issued regulations implementing ELIHPA. *See Prepayment of a HUD–Insured Mortgage by an Owner of Low–Income Housing,* 55 Fed.Reg. 38,944 (Sept. 21, 1990) (codified at 24 C.F.R. §§ 248.101–248.261 (1991)).

### D. Low–Income Housing Preservation and Resident Homeownership Act of 1990

On November 28, 1990, Congress enacted LIHPRHA, § 601(a), 104 Stat. at 4249–50 (1990) (codified at 12 U.S.C. §§ 4101–4124 and other scattered sections of Title 12 of the U.S.Code), which extended indefinitely ELIHPA's temporary requirement that barred owners of housing insured under Section 221(d)(3) from prepaying their mortgages and thus removing the attendant regulatory restrictions, without HUD approval. LIHPRHA § 601(a), 104 Stat. at 4249; *Cienega VII,* 331 F.3d at 1326. HUD promulgated regulations implementing LIHPRHA in April 1992. *See Prepayment of Low Income Housing Mortgages,* 57 Fed.Reg. 12,041 (Apr. 8, 1992) (codified at 24 C.F.R. §§ 248.1–248.319 (1993)).

LIHPRHA's restrictions on prepayment were similar but not identical to those in ELIHPA. The criteria in LIHPRHA for approval of prepayment were more stringent than those in ELIHPA. *See CCA Assocs.,* 75 Fed.Cl. at 176. And while LIHPRHA offered owners incentives to continue in the Section 221(d)(3) program that were similar to those of ELIHPA, the procedures for receiving incentives were more onerous than they were under ELIHPA. *Id.*[9] LIHPRHA

---

8. Regulatory agreements under Section 221(d)(3) required owners to maintain a "reserve fund for replacements" to cover repair expenses and a "residual receipts fund," which consisted of cash remaining after a limited-dividend entity had declared and paid its distributions. *See* PX 2 at ¶ 2 (1969 Regulatory Agreement).

9. LIHPRHA was also substantively more stringent than ELIHPA. Among other things, LIHPRHA removed from ELIHPA's list of possible incentives an increase in the owner's annual distributions. *Compare* § 224(b), 101 Stat. at 1880, *with* 12 U.S.C. § 4109(b). In addition, respecting the extension of use for low-income

also provided an explicit option to sell the property to a HUD-approved purchaser, such as a non-profit organization, a public agency, or a tenant cooperative. *See* 12 U.S.C. § 4101(a).[10] If a sale to a qualified non-profit entity could not be accomplished within a year after a second notice of intent was filed by an owner, LIHPRHA authorized HUD to approve sale to for-profit purchasers who agreed to retain the affordability restrictions for the life of the property. 12 U.S.C. § 4110(c); 24 C.F.R. § 248.101 (1993).

### E. *The Housing Opportunity Program Extension Act of 1996*

In the mid–1990s, Congress sought to change its approach to prepayment. Congress' first attempt in December of 1995 was reflected in a bill, H.R. 2099, that would have allowed owners to prepay mortgages if they agreed not to raise rents for sixty days after prepayment. *See* H.R. 2099, 104th Cong. (1st Sess.1995) (undesignated second paragraph of Title II). Although passed by Congress, *see* 141 Cong. Rec. S18,657–58 (1995) (Senate passage of H.R. 2099), H.R. 2099 was vetoed by President Clinton. *See CCA Assocs.*, 75 Fed.Cl. at 178 (citing 141 Cong. Rec. H 15,061 (1995)). Within months of President Clinton's veto of H.R. 2099, however, Congress passed and President Clinton signed into law the Housing Opportunity Program Extension Act of 1996 ("HOPE"), Pub.L. No. 104–120, 110 Stat. 834. HOPE, enacted on March 28, 1996, reinstated the prepayment rights of owners whose mortgages were insured under Section 221(d)(3). *Id.* § 2(b), 110 Stat. at 834–35 (Mar. 28, 1996). HOPE

did so expressly by incorporating the various conditions on HUD funding set out in H.R. 2099, including the condition making appropriations related to ELIHPA and LIHPRHA contingent on HUD's permitting owners of eligible low-income housing to prepay their mortgages, provided the owners did not raise their rents for sixty days following prepayment. *Id.* HOPE thus lifted the prepayment restrictions imposed by ELIHPA and LIHPRHA. *See Cienega VII*, 331 F.3d at 1326–27.

### F. *HUD's Preservation Letters*

Notwithstanding the enactment of HOPE, reinstating owners' rights to prepay their mortgages after 20 years without HUD approval, HUD sent to its regional offices a series of so-called preservation letters, each of which asserted that certain restrictions on prepayment still were in effect. Less than a month after HOPE became law, a second preservation letter averred that prepayment required HUD approval. PX 63 at 5 (Mem. from Chris Greer, Acting Deputy Assistant Secretary for Multifamily Housing Programs, to Directors of Housing, et al. (Apr. 12, 1996)) ("Preservation Letter No. 2"); 2006 Tr. 216:18 to 218:9 (Norman). A subsequent preservation letter stated that owners need not obtain HUD approval for prepayment, but it set out other requirements, including: (1) that the owner notify HUD of its intention to prepay, (2) that the owner pay fifty percent of the relocation expenses of any tenant, (3) that the lender submit a form to HUD requesting prepayment of the mortgage, and (4) that owners of low-income

---

tenants, LIHPRHA required the extension to be effective for the life of the property, rather than for the remaining period of the 40–year mortgage as ELIHPA had done. *Compare* 12 U.S.C. § 4112(a)(2)(A), *and* 24 C.F.R. § 248.145(a)(2) (1993), *with* ELIHPA, § 224(b)(1), 101 Stat. at 1880–81, *and* 24 C.F.R. § 248.233(d)(1) (1991).

10. The parties disagree whether a sale option was available under ELIHPA. CCA argues that ELIHPA had no statutory sale option, Pl.'s Post-Trial Br. at 28–32 ("Pl.'s Br."), noting that most pertinent provisions of ELIHPA specified that the Secretary of HUD might take "[o]ther actions, authorized in other provisions of law, to facilitate a transfer or sale of the project to a qualified nonprofit organization, limited equity tenant cooperative, public agency, or other entity acceptable to the Secretary." ELIHPA,

§ 224(b)(7). CCA further argues that HUD's regulations did not explicate a procedure or mechanism for addressing a sale, but rather regarding incentives simply referred to "[o]ther actions to facilitate a transfer or sale of the housing to a qualified nonprofit organization, limited equity tenant cooperative, public agency, or other entity acceptable to the Commissioner [of FHA], such as expedited review of a request for approval of a transfer of physical assets." 24 C.F.R. § 248.231 (1991). The government contends that under ELIHPA, HUD could "assist with facilitating the project's sale to [qualified groups]," and that HUD did so. Def.'s Post-Trial Br. at 7 ("Def.'s Br."). This dispute was addressed by considerable testimony at trial and will be considered in the analysis which follows.

housing located in low-vacancy areas—three percent or lower vacancies—not raise rents for three years except as necessitated by increased operating costs. PX 65 at 2–6 (Mem. from Nicholas P. Retsinas, Assistant Secretary for Housing, to Directors of Housing, et. al. (May 3, 1996)) ("Preservation Letter No. 4"); 2006 Tr. 219:22 to 222:19 (Norman). In a sixth preservation letter, HUD scaled back the requirement to pay tenants' relocation expenses to cover only moves "in the area where the project . . . is located," but reiterated the three-year restriction on rent increases for housing in low-vacancy areas. PX 67 at 3, 6–7 (Mem. from Retsinas to Directors of Housing, et al. (July 1, 1996)) ("Preservation Letter No. 6"); 2006 Tr. 223:19 to 224:20 (Norman). With the constantly changing requirements of the preservation letters layered over the statutory mandate of HOPE, the prepayment process remained in a state of flux until HUD released Preservation Letter 97–1 on December 16, 1996, which preservation letter stated that, following the HOPE-mandated sixty-day moratorium on rent increases, there was "no limit to how high the owner [could] raise the rent." 2006 Tr. 234:4 to 235:3 (Norman); PX 75, Attach. at 7 (Mem. from Retsinas to Directors of Housing, et al. (Dec. 16, 1996)) ("Preservation Letter No. 97–1").

### G. The Alexander Study and CCA's Eventual Prepayment

Following the passage of LIHPRHA, CCA filed a notice of intent with HUD in December 1990 to preserve its options under ELIHPA and LIHPRHA. PX 42 (CCA Notice of Intent (Dec. 28, 1990)). A year and one-half later, in June 1992, CCA filed a notice of election to proceed under ELIHPA, while reserving its rights to proceed under LIHPRHA. PX 51 (CCA Notice of Election to Proceed (June 8, 1992)). Prior to the passage of HOPE, however, CCA never filed a plan of action with HUD seeking incentives or permission to sell the property. 2006 Tr. 383:8–16 (Norman). Following the passage of HOPE and despite the confusion caused by the preservation letters, by October 1996 CCA had begun inquiring into options for refinancing its mortgage loan, anticipating that the time when it might be able to prepay its mortgage was approaching. 2006 Tr. 236:7–16 (Norman).

In late 1996, with CCA's permission, Mr. Jim Alexander, then a HUD employee, began a study to examine CCA's options after prepayment, including selling Chateau Cleary or refinancing the property with a conventional mortgage. PX 75a (Letter from Norman to Alexander (Dec. 19,1996)); 2006 Tr. 240:6–10 (Norman), 557:22 to 558:1 (Alexander).[11] Mr. Alexander's study, sent to CCA in April 1997, examined four "possible solutions" for CCA: (1) remain a HUD-insured property, (2) prepay the mortgage and sell the property in one year, (3) prepay the mortgage, make minimal upgrades to the property, and sell the property in seven years, and (4) prepay the mortgage, make major upgrades to the property, and sell the property in seven years. DX 140 at 137 (Alexander Report); 2006 Tr. 558:2–5 (Alexander).[12]

After reviewing the conclusions of the study and discussing them with Mr. Alexander, 2006 Tr. 247:21 to 248:7 (Norman), Mr. Norman adopted a hybrid of two options Mr. Alexander had proposed and began undertaking some improvements to Chateau

---

11. Mr. Alexander's report was not an official HUD report, 2006 Tr. 1077:11 to 1078:22 (Test. of Gladys Ann Kizzier, a HUD employee who supervised Mr. Alexander), but it was the culmination of a HUD-funded and HUD-approved course of study through which Mr. Alexander received the designation of "certified property manager" from the Institute of Real Estate Management ("IREM"). See 2006 Tr. 512:23–25, 514:17–20, 515:20 to 516:2, 520:13 to 521:5 (Alexander). Mr. Alexander's report listed his work address at HUD and was forwarded to Mr. Ernest B. Norman, III, CCA's managing partner, with a cover letter printed on HUD letterhead. See DX 140 at 1, 3 (Alexander Report); but see 2006 Tr. 1078:14 to 1079:1 (Kizzier) (indicating

that Mr. Alexander did not have permission, and would not have received permission, from his direct supervisor to use the HUD letterhead).

12. Although Mr. Norman had explained to Mr. Alexander that CCA planned to prepay its mortgage, PX 75a (Letter from Norman to Alexander (Dec. 19, 1996)), Mr. Alexander included in his report the option to remain in the Section 221(d)(3) program, see DX 140 at 137 (Alexander Report), apparently because the IREM curriculum required that the study include maintaining the status quo among the options to be considered. 2006 Tr. 559:15–20 (Alexander).

Cleary. 2006 Tr. 270:13–19, 273:10–13 (Norman). On April 29, 1998, CCA signed a contract with Hampstead Partners to guide CCA through the prepayment process, delivered the required prepayment notifications to HUD, and after several months of HUD-related administrative delays, prepaid its HUD-insured mortgage on September 30, 1998. 2006 Tr. 1776:19–24, 1780:4 to 1782:15, 1793:4–12 (Test. of Norman Root, a real estate consultant with Hampstead Partners);[13] 2006 Tr. 280:17–22 (Norman); PX 83 (Prepayment Service Consulting Agreement (Apr. 29, 1998)); PX 86 (Letters from Hampstead Partners to HUD, the mortgagee, and a local councilman, announcing CCA's intent to prepay its mortgage (May 11, 1998)).

## STANDARDS FOR DECISION

 The Tucker Act provides this court with jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Although the Tucker Act confers jurisdiction only where a substantive right already exists, *see United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), a contract between a claimant and the government may establish that right. *Ransom v. United States,* 900 F.2d 242, 244 (Fed.Cir.1990). Specifically, "there must be privity of contract between the plaintiff and the United States." *Cienega IV,* 194 F.3d at 1239 (citing *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract.")); *see also National Leased Hous. Ass'n v. United States,* 105 F.3d 1423, 1436 (Fed.Cir.1997) (privity of contract exists only where there is "direct, unavoidable contractual liability necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract"). In deciding whether privity of contract exists as to a particular provision, the court must ascertain whether it was the intent of the parties to be bound by that provision. *See Aspenwood Inv. Co. v. Martinez,* 355 F.3d 1256, 1260 (10th Cir.2004). The plaintiff bears the burden of proof of establishing this element, just as it does oth-

er jurisdictional predicates for a claim. *See McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

 CCA's takings claim arises from the Fifth Amendment, which provides in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter Serv., Inc. v. Federal Aviation Admin.,* 525 F.3d 1299, 1309 (Fed.Cir.2008). The government must pay just compensation when its actions amount to a compensable taking of a legally cognizable property interest. *American Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1372 (Fed.Cir.2004). Precedents of long standing have established two types of takings cases, physical and regulatory. *See Yee v. City of Escondido,* 503 U.S. 519, 522–23, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). A physical taking consists of an occupation of all or part of an individual's property. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 421, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve"). A regulatory taking occurs "when a regulatory or administrative action places such burdens on the ownership of private property that essential elements of such ownership must be viewed as having been taken." *Hendler v. United States,* 36 Fed.Cl. 574, 585 (1996), *aff'd,* 175 F.3d 1374 (Fed.Cir. 1999). "The focus of the regulatory takings analysis is on fundamental fairness-is it fair for the government to impose the cost of a regulation on private parties rather than on the public as a whole through public spending?" *Cienega X,* 503 F.3d at 1278 (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). A *per se* regulatory taking occurs

---

**13.** Mr. Root did not testify at trial, but by agreement of the parties, his deposition testimony, taken on May 24, 2000, was read into the trial record. 2006 Tr. 1770:18–23.

where a regulation deprives a landowner of all economically beneficial uses of his or her property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Where the property has not been deprived of all economically viable uses, the court will conduct an "essentially ad hoc, factual inquir[y]" focused on three factors: (1) the character of the governmental action, (2) the degree of interference with the reasonable, investment-backed expectations of the property owner, and (3) the economic impact of the action. *See Penn Central*, 438 U.S. at 124–28, 98 S.Ct. 2646; *see also Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 325–328, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Palazzolo*, 533 U.S. at 634, 121 S.Ct. 2448 (O'Connor, J., concurring). And, for regulatory takings claims of a temporary nature, *Tahoe–Sierra* adds a fourth factor to those explicated in *Penn Central*, viz., (4) the duration of the restriction. *See Tahoe–Sierra*, 535 U.S. at 342, 122 S.Ct. 1465. No *Penn Central* factor by itself is determinative; rather, all of the factors are to be weighed in a balance that takes into account all of the circumstances. *Palazzolo*, 533 U.S. at 635–36, 121 S.Ct. 2448 (O'Connor, J., concurring).

## ANALYSIS

### I. CCA's CONTRACTUAL CLAIM

Countering CCA's allegation that the government abrogated its contractual obligations with CCA when Congress passed legislation preventing CCA from prepaying its mortgage, the government argues that there is no privity of contract between CCA and the government as to the right to prepay. Def.'s Br. at 14.[14] In support of its argument, the government points to the *Cienega IV* decision, in which the Federal Circuit ruled that HUD was not in privity with property owners under the same statutory scheme and concerning a contractual arrangement similar to that in this case. *See* Def.'s Br. at 14 (citing *Cienega IV*, 194 F.3d at 1246). CCA argues that *Cienega IV* is not controlling because it is distinguishable on the facts. Pl.'s Br. at 36.

### A. Integrated Documents

▮▮▮ The government bases its contention that privity is lacking between CCA and HUD on the fact that HUD was an endorser on, not a primary party to, the secured note, the only document in the triad of secured note, mortgage, and regulatory agreement to explicitly set forth CCA's prepayment right. *See* Def.'s Br. at 18–19.[15] While HUD was a

---

14. The government also resists CCA's contractual claim on the grounds that the Federal Circuit's remand instructions preclude consideration of the claim and because the claim was waived by CCA when it was not tried in the 2006 trial. *See* Def.'s Br. at 13–14. This court has already addressed these arguments. In an order prior to the retrial, this court held that the Federal Circuit's remand specifically directed this court to "allow both sides to supplement the record with additional relevant evidence," and that CCA "neither waived nor abandoned its contractual claim." *CCA Assocs. v. United States*, 87 Fed.Cl. 715, 721 (2009) (citing *CCA Assocs.*, 284 Fed. Appx. at 811). Accordingly, at the retrial CCA pursued its breach-of-contract claim along with its temporary takings claim.

15. The question arises why HUD's endorsement of the secured note (or, in the case of *Cienega IV*, the deed of trust note) did not of itself establish privity of contract, a result that the court in *Cienega IV* and the parties to this case took for granted. *See Cienega IV*, 194 F.3d at 1241–42 (stating that the government was a named party to only one contract, the regulatory agreement). The situation here is analogous to that created with a surety bond, by which a surety provides

either a payment bond or a performance bond, or both. "A surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee." *Insurance Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed.Cir.2001) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed.Cir.1985)). That relationship alone does not create privity of contract; rather it evinces a nascent equitable right of subrogation in which the surety can, under appropriate circumstances, "step into the shoes of the contractor for the purpose of satisfying ... jurisdictional requirements." *Travelers Indem. Co. v. United States*, 72 Fed.Cl. 56, 60 (2006) (citing *Insurance Co. of the W.*, 243 F.3d at 1373). The doctrine of equitable subrogation has been described by the Supreme Court as one "not founded on contract[, but rather,] ... a creature of equity ... enforced solely for the purpose of accomplishing the ends of substantial justice[ ] and ... independent of any contractual relations between the parties." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 n. 12, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (internal quotation marks omitted) (citation omitted). "[A] surety who pays the debt of another is entitled to all the

party to the regulatory agreement, that document did not mention the prepayment right or incorporate the secured note, *see id.*, although it did refer to HUD's regulations which specified the prepayment right. DX 1 at second undesignated paragraph.

CCA argues that the three relevant documents—the regulatory agreement (DX 1), the secured note (PX 3), and the mortgage (PX 4)—constitute "one overall transaction among the Norman Brothers, HUD[,] and the lender." Pl.'s Br. at 36. In support of this contention, CCA points out that all three documents were drawn up on pre-printed, standard HUD forms and were signed contemporaneously in a conference room in HUD's New Orleans office. *See* DX 1 (Regulatory Agreement, FHA Form No. 1730); PX 3 (1969 Note, FHA Form No. 1734); PX 4 (1969 Mortgage, FHA Form No. 4123–B); 2009 Tr. 35:7–12 (Norman). Each document was also essential to the transaction; none of the documents taken alone would have sufficed to provide the parameters of the agreement.

For obvious reasons, the secured note expressly incorporated the mortgage. PX 3 at seventh undesignated paragraph. HUD regulations were also incorporated into HUD's endorsement of the note. HUD's endorsement states that HUD's provision of insurance is "under Section 221(d)(3) of the National Housing Act and Regulations thereunder of the Federal Housing Commissioner," PX 3, which regulations provided for prepayment by owners such as CCA after 20 years. *See* 24 C.F.R. § 221.524(a)(1)(ii) (1971); 24 C.F.R. § 236.30(a)(1)(i) (1970). Correlatively, the regulatory agreement between CCA and HUD expressly referred to HUD's provision of insurance, accomplished

via the endorsement by HUD of the secured note, as well as to Section 221(d)(3) of the National Housing Act and the accompanying regulations. DX 1 at second undesignated paragraph. The regulatory agreement thus incorporated by reference the mandates of Section 221(d)(3) and the associated regulations, which included the right to prepay the mortgage after 20 years. *CCA Assocs.*, 75 Fed.Cl. at 188. In addition, the mortgage referred to and incorporated by reference both the secured note and the regulatory agreement. PX 4 at first undesignated paragraph ("Said Note and all of its terms are incorporated herein by reference."); *id.* at ¶ 3 ("[T]he Regulatory Agreement, executed by the Mortgagor and the Federal Housing Commissioner, which is being recorded simultaneously herewith, is incorporated in and made a part of this Mortgage."). Thus, there is no doubt that the government, by providing the forms for the documents that were executed in this case, intended to provide the basis for a single, integrated transaction.

The common law is directly relevant. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 607, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (internal quotation marks omitted) (citation omitted). It is black letter contract law that multiple documents, executed contemporaneously and relating to the same transaction, should be read together to determine the intent of the parties. *See, e.g., Joy v. City of St. Louis*, 138 U.S. 1, 38, 11 S.Ct. 243, 34 L.Ed. 843

rights of the person he paid to enforce his right to be reimbursed." *Id.* at 137, 83 S.Ct. 232.

Applying this analogy to the instant case, HUD's endorsement insuring the secured note created a three-party relationship obligating HUD to pay the mortgage if CCA defaulted, but it also provided HUD with a potential right of equitable subrogation to assume the lender's rights against CCA. Something similar to this actually happened in *City Line Joint Venture v. United States*, 503 F.3d 1319 (Fed.Cir.2007). City Line was a developer that entered the Section 221(d)(3) program by obtaining a mortgage from a private lender, the loan being insured by

HUD. *Id.* at 1320–21. When City Line defaulted on its loan, the lender assigned its rights to the mortgage to the insurer, HUD. *Id.* at 1321. City Line caught up on its mortgage payments and then, after the passage of ELIHPA and LIHPRHA, sued the government for breach of contract for abrogating its prepayment right. *Id.* at 1322. Privity of contract was not contested by the government because, as the court explained, "the mortgage and note were assigned to HUD in 1977, [and thus] HUD was a party to the mortgage agreement which allowed prepayment without HUD approval after twenty years." *Id.* at 1322.

(1891) (Two tripartite agreements and a deed "constituted a single transaction, relating to the same subject-matter, and should be construed together in such a way as to carry into effect the intention of the parties, in view of their situation at the time and of the subject-matter of the instruments."); *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1513 (3d Cir.1994) ("Where two or more contracts are part of the same transaction and relate to the same subject-matter, are known to all the parties, and are delivered at the same time to accomplish an agreed purpose, such contracts must be construed together as parts of the same transaction; and this is so even though the contracts are not executed between the same parties.") (citation omitted); *Restatement (Second) of Contracts* § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); 5 *Corbin on Contracts* § 24.21 at 216 (1998) (Where the terms of an agreement are expressed in two or more separate documents, "these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others.").

The applicability of this fundamental contract principle was brought into sharp focus in the *Cienega IV* case, on facts similar to those here. Landowner plaintiffs who had entered into the Section 221(d)(3) and Section 236 programs with HUD brought suit in this court alleging that the government breached its contract with the owners when Congress enacted ELIHPA and LIHPRHA, which eliminated their right to prepay their mortgages after 20 years. *Cienega IV,* 194 F.3d at 1235–36.[16] The government argued that there was no privity between HUD and the owners as to the prepayment right because "[t]he prepayment provisions ... were contained in [riders to] the deed of trust notes entered into by plaintiffs and their lenders, not in the regulatory agreement into which HUD entered with the owners." *Cienega Gardens v. United States,* 33 Fed.Cl. 196, 208 (1995) ("*Cienega I*"). A judge of this court rejected this argument, reasoning that "[t]he two documents, which were signed contemporaneously, must be read together in order to determine the full intentions of the parties when they initially entered into their relationship." *Id.* at 210 (citing *Restatement (Second) of Contracts* § 202). The court granted summary judgment for the plaintiffs on their breach of contract claim, finding "that when the parties ... entered into the regulatory agreement they also intended to be mutually bound by the prepayment rules." *Id.* The trial court then proceeded with the contractual claim and ultimately entered judgment for the property owners on that claim. *See Cienega Gardens v. United States,* 38 Fed.Cl. 64 (1997) ("*Cienega II*").

A divided panel of the Court of Appeals for the Federal Circuit reversed this ruling. *Cienega IV,* 194 F.3d at 1246. The majority acknowledged the contract principle upon which the lower court had relied, stating, "[w]e agree with the Court of Federal Claims that all of the agreements before us are relevant in determining the meaning of each separate contract." *Id.* at 1243.[17] But the majority found instead that "[w]hile the deed of trust note (and the incorporated Rider A) and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties." *Id.* Apart from the rider to the note, HUD was only a party to the regulatory agreement, which did not address prepayment. *Id.* While the deed of trust note and rider incorporated the regulatory agreement, the regulatory agreement did not incorporate the note or the rider. *Id.* at 1242. The court held that "the contract documents simply do not show privity of

---

16. The plaintiffs in that case also raised a Fifth Amendment takings claim, which was deferred and not perfected until after the *Cienega IV* decision struck down their breach of contract claim.

17. The majority's statement misconstrued the contract principle upon which the lower court relied. The purpose of reading integrated documents together is to determine the scope of the contract rights created between or among the parties; it asks what the agreement is. The majority instead assumed that each document represented a "separate contract" without first determining, from an analysis of the entire transaction, what obligations were involved overall.

contract between the Owners and HUD with respect to a right to prepay the mortgage loans after twenty years without HUD approval." *Id.* at 1243.

Senior Judge Archer, in dissent, criticized the majority for "consider[ing] each of the documents ... in virtual isolation." *Cienega IV*, 194 F.3d at 1249 (Archer, J., dissenting). Instead he argued that "in [a] complex integrated transaction[ ] of this sort, where multiple parties execute[ ] multiple documents at closing[,]" the lower court was "entirely appropriate" in "find[ing] the parties' intent based on all of the documents and the surrounding facts and circumstances." *Id.* Senior Judge Archer pointed to four factors that supported the conclusion that privity existed between the owners and the government regarding prepayment: "[1] the overall purpose and nature of the transactions, [2] the intent of the parties, [3] the terms and conditions of HUD's Commitments for Insurance of Advances, and [4] the references in the HUD's Commitments and endorsements of the Notes to specific, dated HUD regulations governing these transactions." *Id.* at 1247. Given these factors, he would have affirmed the trial court's determination that the parties, in entering into the regulatory agreement, "also intended to be mutually bound by the prepayment rules set forth in the rider to the contemporaneous deed of trust note." *Id.* at 1248 (internal quotation marks omitted) (citation omitted).

The Tenth Circuit also addressed this identical issue but reached a divergent result from that of the majority in *Cienega IV*. *Aspenwood Investment Co.*, 355 F.3d at 1257–58, involved an owner who entered into the Section 236 program with HUD and executed a note, deed of trust, and regulatory agreement similar to those executed in this case. The court addressed whether the owner's prepayment rights were governed by the terms of the note or by the applicable agency regulations. *See id.* at 1259. If HUD was not bound by the terms of the note because it was not in privity with the owner or the lender, then the owner's prepayment rights would "turn on the validity of HUD's interpretation of its own regulations, to which federal courts owe considerable deference." *Id.* If, however, HUD was bound by the terms of the note, then ordinary rules of contract interpretation would apply. *Id.* The Tenth Circuit looked to the decision in *Cienega IV* as "[t]he case most directly on point," but found "the analysis of the dissent ... more persuasive." *Id.* at 1260. The court held:

> [T]he manifest intent of the parties was to enter into a transaction in which each part, as represented by the various documents, was an essential element of the whole; the meaning of each element can be understood only in the context of all of the other elements. In other words, there is a single, overarching agreement. We conclude that it was the demonstrated intent of HUD (and of plaintiff and of the lender) to be bound by the terms of all of the parts of the transaction.

*Id.*[18]

 The interrelationship of the three documents in this case is evident. The salient problem is that the regulatory agreement does not expressly incorporate the terms of the secured note and the mortgage. By contrast, the mortgage expressly incorporates the secured note and the regulatory agreement, and the secured note explicitly incorporates the mortgage and thus also the regulatory agreement. Does the failure of the regulatory agreement to expressly incor-

---

18. In this same vein, a law review article has also criticized the majority's result in *Cienega IV*: "In holding that HUD created no privity on the prepayment issue, the *Cienega Gardens* court ignored fundamental principles of contract law." Henry A. Herrman, *Privity: How HUD Avoided Contract Liability Under ELIHPA and LIHPRHA*, 30 Sw. U.L.Rev. 323, 325 (2001). In his critique, Mr. Herrman argued that the court erred when it skipped the question of whether an agreement was formed between HUD and the owners to focus on contract interpretation. *Id.* at 342–43.

"The critical question in *Cienega Gardens* was whether HUD and the Owners each bargained for, and each received, mutual assent to enter into an agreement concerning the Owners' prepayment rights." *Id.* at 345. There was "convincing evidence that HUD bargained for a promise from the Owners that they would operate the projects for twenty years before prepaying the mortgages and canceling the affordability restrictions, and in return agreed to insure the mortgage Note." *Id.* at 350.

porate the other two instruments negate the general contractual principle that interrelated instruments should be considered together? This court respectfully doubts that this question should be answered in the affirmative or that the majority in *Cienega IV* was correct in considering that the regulatory agreement should be construed as a separate contract. Rather, each of the three documents should be read together to determine what contractual obligations the parties undertook. Doing so gives effect to the fact that the 20–year limit on prepayment contained in the secured note was a provision drafted by HUD that replicated HUD's regulations on prepayment and was used by HUD to induce participation in the program. PX 3 (secured note printed on FHA Form No. 1734); 24 C.F.R. § 221.524(a)(1)(ii) (1971); 24 C.F.R. § 236.30(a)(1)(i) (1970); 2006 Tr. 57:18 to 58:15 (Norman); *cf. Cienega VII*, 331 F.3d at 1346–47 (the prepayment right "was one of the primary incentives HUD offered precisely to encourage [the owners'] voluntary participation in the public housing programs"). The three documents were drawn up on HUD forms and signed contemporaneously at HUD's office. *See* DX 1 (Regulatory Agreement, FHA Form No. 1730); PX 3 (1969 Note, FHA Form No. 1734); PX 4 (1969 Mortgage, FHA Form No. 4123–B); 2009 Tr. 35:7–12 (Norman). The 20–year limitation on prepayment was not negotiated between CCA and the lender but was instituted by HUD, as evidenced by the HUD regulations and by the language of the secured note drafted by HUD.

### B. Congress' Awareness It Was Abrogating Contracts by Adopting ELIHPA and LIHPRHA

Congress, in debating the proposed bills that would become ELIHPA and LIHPRHA, considered the issue of whether it would, by eliminating the prepayment option, abrogate contracts with the property owners who had entered the Section 221(d)(3) program. During the Senate debate on LIHPRHA, questions arose whether it would be legal to abrogate the contracts and whether there were sufficient measures to compensate the owners. *See* 136 Cong. Rec. 26,372 (1990) (Senator Heflin describing the proposed leg-

islation as "unilaterally abrogating a contract, which has been adhered to by one party for 20 years," and Senator Breaux stating, "[u]nilateral abrogation of 20–year–old contracts is not the way to build confidence"); *see also id.* at 26,383–84 (Senator Armstrong observing that property owners who entered into contracts with HUD "probably had the mistaken notion that the Federal Government was going to honor its word"). While it is true that "statements in the legislative histories of ELIHPA and LIHPRHA cannot alter the content of the documents on which the Owners attempt to base their contractual claims," *Cienega IV*, 194 F.3d at 1244, the legislators' observations evidence Congress' understanding that contractual obligations did exist between HUD and the owners.

### C. The Amendment Clause of HUD's Regulations

■ To bolster its conclusion that HUD did not intend to be bound by the prepayment provision, the majority in *Cienega IV* pointed to a clause in the regulations relating to amendments:

The regulations in this subpart may be amended by the Commissioner [of FHA] at any time and from time to time, in whole or in part, but such amendments shall not adversely affect the interest of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

*Cienega IV*, 194 F.3d at 1244 (citing 24 C.F.R. §§ 221.749, 236.249 (1970)). The majority opined that "it would have been inconsistent for HUD to have entered into the regulatory agreement if the agreement fixed the prepayment rights of the Owners, in view of the express power to amend the Section 221(d)(3) and Section 236 program regulations at any time that was reserved to HUD, subject only to the caveat that *mortgagees'* interests not be adversely affected." *Cienega IV*, 194 F.3d at 1244. The court stated that HUD had the "express power" to amend the regulations and have the amended regu-

lations apply retroactively to property owners already in the Section 221(d)(3) program. *Id.* The second part of that postulate is questionable because it assumes that the regulations contemplate retroactive application to mortgagors. The regulations do not so state. Rather, the amendment clause is written as a declaration—that the Commissioner can amend the regulations at any time—with a caveat—as long as an amendment does not adversely affect the interest of a mortgagee or lender.

■■■■ Retroactive application of a law or regulation is generally disfavored and usually requires an express Congressional statement that a law or regulation is intended to apply retroactively. *See, e.g., Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (The "presumption against retroactive legislation is deeply rooted in our jurisprudence."); *Sierra Med. Ctr. v. Sullivan*, 902 F.2d 388, 392 (5th Cir. 1990) ("Generally, courts will not apply regulations retroactively unless their language so requires.").[19] As the dissent in *Cienega IV* points out, "these transactions were consummated under the provisions of regulations in effect as of specific dates." *Cienega IV*, 194 F.3d at 1250 (Archer, J., dissenting). HUD "expressly stated that the insurance endorsements would be made under the pertinent provisions of the National Housing Act and 'the Regulations thereunder *now in* effect.'" *Id.* In short, the owners were subject to the regulations in effect at the time they entered into their contracts, which permitted them to prepay their mortgage notes after twenty years without HUD approval. *See id.*

■■■ To reach the majority's conclusion contrary to HUD's express statement that the regulations in existence at the time of the insurance endorsement were to be applied, one would have to draw a negative inference from the caveat in the amendment clause. *See* 24 C.F.R. §§ 221.749, 236.249 (1970). The caveat states that amendments may not adversely affect mortgagees or lenders under contract. The negative implication would be that HUD may amend the regulations to retroactively affect others such as mortgagors who are under contract. This implication is problematic because it does not constitute an express affirmative statement and runs counter to the constraints on applying regulations retroactively. Moreover, the negative implication would create an illusory contract. "[A] party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *New Valley Corp. v. United States*, 119 F.3d 1576, 1584 (Fed.Cir.1997) (internal quotation marks omitted); *see also Ridge Runner Forestry v. Secretary of Agric.*, 287 F.3d 1058, 1062 (Fed.Cir.2002) ("It is axiomatic that a valid contract cannot be based upon the illusory promise of one party[.]"); *System Fuels, Inc. v. United States*, 66 Fed.Cl. 722, 731 (2005) ("As a matter of law ... the [g]overnment cannot amend the terms of [a contract] *sua sponte* and without separate consideration evidencing acceptance of new terms.") (citing *California Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001)); 1 *Corbin on Contracts* § 145 at 627 (1963) ("If what appears to be a promise is an illusion, there is no promise."). The Section 221(d)(3) program set up a framework in which HUD, lenders, and property owners entered into an agreement to establish low-income housing. If one

---

**19.** In addressing the retroactivity question, courts have been careful first to decide whether retroactivity was intended:

> Determination of whether a regulation or statute is impermissibly retroactive requires a two-step analysis. First, we must determine whether the statute or regulation clearly expresses that the law is to be applied retroactively. If it does, then the statute or regulation may be applied as such.... However, if the statute or regulation does not contain an express command that it be applied retroactively, we must go to the second step which requires us to determine whether the statute or regulation would have a retroactive effect.

*Kankamalage v. INS*, 335 F.3d 858, 862 (9th Cir.2003) (citing *Landgraf*, 511 U.S. 244, 114 S.Ct. 1483). "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." *INS v. St. Cyr*, 533 U.S. 289, 321, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (internal quotation marks omitted) (citation omitted). "[T]he judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (internal quotation marks omitted) (citation omitted).

reads the amendment clause as giving HUD the ability to unilaterally amend the regulations to the owners' detriment, then the contract is illusory.

That the result in *Cienega IV* is questionable is bolstered by the *Franconia* cases, which involved a housing program that permitted the Farmers Home Administration ("FmHA") to issue loans to promote the development of affordable rental housing in rural areas. *See Franconia Assocs. v. United States,* 536 U.S. 129, 132–33, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002).[20] The developers who obtained loans from FmHA under this program signed promissory notes which included a prepayment option permitting loan repayment "at any time at the option of [the][b]orrower." *Id.* at 135, 122 S.Ct. 1993. However, Congress acted to remove this prepayment option in virtually the same way that it did for the prepayment right attendant to loans made under HUD's Section 221(d)(3) program. Noting a "dwindling supply of low– and moderate-income rural housing in the face of increasing prepayments of mortgages," Congress passed provisions in ELIHPA which "impose[d][p]ermanent restrictions upon prepayment of § 515 mortgages." *Id.* at 136, 122 S.Ct. 1993. The plaintiffs in *Franconia,* developers under the FmHA program who wished to prepay but were no longer able to, sued on a breach of contract theory. *Id.* at 138, 122 S.Ct. 1993.

After the Supreme Court rejected a contention that the *Franconia* suit was barred by the statute of limitations, *see* 536 U.S. at 149, 122 S.Ct. 1993, the case was duly remanded to the Court of Federal Claims for trial. *Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 728–29 (2004). In contrast to the case before this court, privity was not at issue because the government was the lender. However, the government argued that, notwithstanding the prepayment provision, it had the authority to impose substantial conditions upon that prepayment through subsequent regulation. *Id.* at 730 n. 13. The court rejected this argument, stating that to give meaning to the prepayment provision,

"prepayment could not be subject to anything more than perhaps simple procedural requirements (*e.g.,* filing an application and allowing for processing time), and otherwise [be] without restriction." *Id.* More specifically, the government relied on language in the loan agreements stating "any loan made or insured ... will be administered subject to the limitations of the authorizing act of Congress and related regulations" to contend that the owners were subject to changing terms. *Id.* at 732. The court dismissed this argument, reasoning that "were this 'subject to' language to mean that the prepayment option could be limited by Congress or the FmHA virtually at will, the same would hold true of all the government's obligations under the agreements, rendering these contracts illusory." *Id.; see also Mobil Oil,* 530 U.S. at 616–17, 120 S.Ct. 2423 (reference in lease that it was "subject" to certain "future regulations" makes "clear" that a catchall provision referring to "all other applicable ... regulations," must include only statutes and regulations already existing at the time of the contract); *United States v. Winstar Corp.,* 518 U.S. 839, 868, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (rejecting an argument by the government that its "obligations could change along with the relevant regulations" because then-current regulations were specifically incorporated as part of the pertinent agreement); *Marathon Oil Co. v. United States,* 177 F.3d 1331, 1337 (Fed.Cir.1999) ("To read the original contract between the parties as incorporating all future actions, whether by statute or regulation, by one of the parties would raise serious questions about illusory contracts, and perhaps questions of due process and other constitutional concerns.").

In sum, because of the lack of an express term requiring retroactive application of regulations, the disfavor shown to any such retroactive application because of due process considerations, and the guide to interpretation that would avoid creation of an illusory promise, the amendment provision of HUD's regulations should not be read to grant HUD the ability retroactively to amend the regula-

---

**20.** This loan program was enacted under §§ 515 and 521 of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a.

tions against the interests of property owners.

### D. Plaintiff's Attempt to Distinguish Cienega IV

Considering that the documents at issue constitute an integrated transaction, and in light of the other circumstances surrounding the transaction, this court, but for the precedent in *Cienega IV*, would hold that HUD and CCA were in privity as to the 20–year prepayment provision. The mutually supportive promises by CCA and by HUD resulted in a transaction succinctly described by the trial court in *Cienega III*, as follows:

> [B]y signing the regulatory agreement and the deed of trust note to which the regulatory agreement referred, plaintiffs promised to construct and maintain housing in accordance with HUD's specifications, to accept only low– or moderate-income persons as tenants, to charge no higher rents than those permitted by HUD, to distribute profits to shareholders in accordance with specified limitations, to make timely payments on their mortgages and to maintain cash reserves to self-insure against mortgage default. These promises were made expressly to and for the benefit of the government, not third parties. In exchange, the government agreed to endorse and insure the mortgages, allowing plaintiffs to obtain either subsidized commercial loans or loans at favorable interest rates, and to allow plaintiffs to free themselves of HUD's regulatory strictures after the first 20 years.

*Cienega III*, 38 Fed.Cl. at 70–71. Accordingly, but for *Cienega IV* this court would find that Congress breached the government's contract with CCA with respect to its prepayment rights when it enacted ELIHPA and LIHPRHA.

The government asserts that this court is bound by the Federal Circuit's ruling in *Cienega IV*. Def.'s Br. at 14. The court agrees that it "may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit." *Crowley v. United States*, 398 F.3d 1329, 1335 (Fed.Cir. 2005). That is so however much this court might question the decision in *Cienega IV*. As a consequence, CCA makes a valiant effort to distinguish *Cienega IV* on its facts. As distinguishing facts, it posits that: "(i) [t]he Norman Brothers specifically understood that the transaction documents formed three essential parts of one agreement, *see* 2009 Tr. 35:17–25 (Norman); (ii) HUD touted the prepayment right in contract negotiations, *see* [*CCA Assocs.*,] 75 Fed.Cl. at 192; and (iii)[t]he parties signed the agreements together, in a HUD conference room. 2009 Tr. 35:7–12 (Norman)." Pl.'s Reply at 18. The latter two proffered facts fail to distinguish *Cienega IV*. *See Cienega I*, 33 Fed.Cl. at 210 (the relevant documents "were signed contemporaneously"); *Cienega VII*, 331 F.3d at 1346–47 (the prepayment right "was one of the primary incentives HUD offered precisely to encourage [the owners'] voluntary participation in the public housing programs"); *see also Cienega IV*, 194 F.3d at 1245 ("HUD's involvement in the contracts between the private lending institutions and the Owners[, such as conceiving the structure of the transaction, prescribing and approving all of the relevant documents and furnishing most of the specific language,] could not create ... a contractual relationship."). In addition, the first proffered distinction by CCA, *viz.*, whether the property owners understood the documents to form three essential parts of one agreement, does not change the Federal Circuit's analysis in *Cienega IV*. There, as discussed previously, the Federal Circuit's majority stated that "[w]hile the deed of trust note (and the incorporated Rider A) and the regulatory agreement were part of the same transaction, each document stands alone and is unambiguous on its face. The documents evidence separate agreements between distinct parties." *Cienega IV*, 194 F.3d at 1243.

Consequently, the court reluctantly must conclude that the majority's view in *Cienega IV* is controlling. Accordingly, the court has no choice but to find that there is no privity of contract between HUD and CCA. CCA's breach of contract claim therefore must be dismissed for lack of subject matter jurisdiction. *See Cienega IV*, 194 F.3d at 1239 (citing *Erickson Air Crane*, 731 F.2d at 813 ("The government consents to be

sued only by those with whom it has privity of contract."")).

## II. TAKINGS CLAIM

■ Where a viable contract claim exists, the court generally will not proceed to an accompanying takings claim. A contractual breach typically precludes a taking because a plaintiff retains "the full range of remedies associated with its contractual property rights." *City Line Joint Venture*, 503 F.3d at 1323. Having dismissed CCA's contract claim, the court proceeds to its takings claim.

CCA contends that the government effected a temporary regulatory taking of its property when Congress passed ELIHPA and LIHPRHA and abrogated its prepayment rights. This court conducted an earlier *Penn Central* analysis and found that a taking did in fact occur. *CCA Assocs.*, 75 Fed.Cl. at 188–99. However, the Federal Circuit vacated that decision on appeal, instructing the court to reconsider the takings issue in light of the *Cienega X* decision. *CCA Assocs.*, 284 Fed.Appx. at 811.[21] The majority in *Cienega*

X raised four issues that it instructed this court to address anew: (1) the economic effect of the regulation on the property as a whole; (2) the offsetting benefits under EL-IHPA and LIHPRHA; (3) the limited duration of ELIHPA and LIHPRHA; and (4) the nexus between the owners' expectations and their investment in the property. *Cienega X*, 503 F.3d at 1277–78. The first two issues relate to the economic-impact prong of the *Penn Central* analysis, the third issue concerns the fourth *"Penn Central"* factor added by the Supreme Court's decision in *Tahoe–Sierra*, and the last issue relates to the reasonable investment-backed expectations of the property owners.

### A. Kaiser Aetna *Analog*

Before applying the three *Penn Central* factors plus the factor added by *Tahoe–Sierra* in light of the *Cienega X* decision, CCA argues preemptively that "consideration of the character of the governmental action here alone supports the finding of a taking." Pl.'s Reply at 2 n. 1. CCA contends that "[t]he character of the governmental action

---

**21.** The takings claims in the *Cienega* litigation were first tried by the court of federal claims with four model plaintiffs. *See Cienega X*, 503 F.3d at 1274–75. After the trial court had found in plaintiffs' favor on their contractual claims, followed by a reversal on privity grounds by the Federal Circuit in *Cienega IV*, the trial court ruled in the government's favor respecting the takings claims, finding that those claims were not ripe for consideration. *Cienega Gardens v. United States*, 46 Fed.Cl. 506 (2000). On appeal, the Federal Circuit ruled that the takings claims were ripe notwithstanding the owners' failure to seek HUD approval for prepayment because any request for approval would have been futile. *Cienega VI*, 265 F.3d 1237. On remand, the trial court again denied relief, holding that there was no regulatory taking under a *Penn Central* analysis. *See Cienega Gardens v. United States*, No. 94–1C (Fed.Cl. Jan. 8, 2002) (adopting the rationale of a decision in *Alexander Inv. v. United States*, 51 Fed.Cl. 102 (2001)). On appeal, the Federal Circuit again reversed, finding a taking and ordering that the judgment previously entered on the contractual claims should be reinstated, subject to adjustment. *Cienega VII*, 331 F.3d at 1324. The cases were transferred to the undersigned judge and then the claims of the non-model *Cienega* plaintiffs were consolidated with those of three plaintiffs from the *Chancellor Manor* case. *See Cienega X*, 503 F.3d at 1276–77 (referring to *Chancellor Manor v. United States*, 331 F.3d 891 (Fed.Cir.2003), a case raising the same types of claims as those in the *Cienega*

case). After retrial, the court found a taking, applying the takings analysis used by the Federal Circuit in *Cienega VII*. *See Cienega Gardens v. United States*, 67 Fed.Cl. 434, 437–38 (2005) ("*Cienega IX*"). The Federal Circuit, however, vacated the judgment on appeal and remanded, departing in significant respects from the *Penn Central* analysis employed in *Cienega VII*, opining that the *Cienega VII* decision was "based on a partial record and limited arguments made by the government." *See Cienega X*, 503 F.3d at 1275–76 (stating that "the holdings of *Cienega VII* were unique to the four model plaintiffs and based on the particular arguments that the government made").

The claims of the four model plaintiffs addressed in *Cienega IV*, *VI*, and *VII* were subsequently resolved under the *Independence Park* caption. *See Independence Park Apts. v. United States*, 61 Fed.Cl. 692 (2004), *on reconsideration in part*, 62 Fed.Cl. 684 (2004), *reversed and remanded*, 449 F.3d 1235, *clarified on rehearing*, 465 F.3d 1308.

A petition for writ of certiorari was filed *sub nom. Cienega Gardens v. United States*, No. 07–1100, but the petition was dismissed based upon an agreed settlement between the parties, *see* —— U.S. ——, 129 S.Ct. 17, 171 L.Ed.2d 921 (2008), which settlement entailed payment by the government of $37 million, inclusive of interest. *See* Stipulation of Dismissal With Prejudice, *Cienega Gardens v. United States*, No. 94–1 (Fed.Cl. July 18, 2008) (docketed item no. 284).

here—abrogating CCA's fundamental right to exclude others (as well as sharply restricting CCA's right to sell, assign or make some other use of the land on which Chateau Cleary sits)—approximates a conventional, physical taking and therefore *requires* the government to pay just compensation without regard to the quantum of economic impact and regardless of whether CCA had investment-backed expectations." Pl.'s Br. at 14. Essentially, CCA argues that consideration of the character-of-the-government-action factor alone dictates the finding of a taking.

The Supreme Court has held that the right to exclude, "so universally held to be a fundamental element of the property right, falls within [the] category of interests that the Government cannot take without compensation." *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *see also Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 539, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) ("[T]he owner's right to exclude others from entering and using her property [is] perhaps the most fundamental of all property interests."). CCA asserts that its fundamental right to exclude has been abrogated by ELIHPA and LIHPRHA. Pl.'s Br. at 13. Correlatively, this court has noted that "by allowing HUD to control CCA's tenant pool beyond the twenty-year mark, the preservation statutes created a situation analogous to a physical invasion or a holdover tenancy." *CCA Assocs.,* 75 Fed.Cl. at 190. Correspondingly, the Federal Circuit in *Cienega VII* characterized the government action as "intentionally defeat[ing] the Owners' real property rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years." *Cienega VII,* 331 F.3d at 1328; *see also Palmyra Pac. Seafoods, L.L.C. v. United States,* 561 F.3d 1361, 1368 (Fed.Cir.2009) (reading *Cienega VII* as holding that the preservation statutes "authorized what amounted to a traditional appropriation of real property rights, just as if the government had ordered the owners to continue devoting their properties to low-income housing use after their contractual obligation to do so had expired").

However, the government's abrogation of CCA's prepayment right does not by itself *"require* [ ] the government to pay just compensation without regard to the quantum of economic impact and regardless of whether CCA had investment-backed expectations." Pl.'s Br. at 14. CCA reaches too far when it asserts that it was "wholly deprived ... of its fundamental property right to exclude others from Chateau Cleary." Pl.'s Br. at 10. The two cases on which CCA primarily relies, *Kaiser Aetna* and *Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), are not analogous. This is not an instance of the government creating a public easement on plaintiff's property, as in *Kaiser Aetna.* In *Kaiser Aetna,* an owner-lessee of a private lagoon, with the consent of the Army Corps of Engineers, dredged a channel to convert a shallow pond into a marina connected to Maunalua Bay, in Hawaii. *Kaiser Aetna,* 444 U.S. at 167, 100 S.Ct. 383. The government subsequently claimed that the pond, "as a result of the improvements, ... had become a navigable water of the United States" and as such the owners were precluded from denying the public access. *Id.* at 168, 100 S.Ct. 383. The Court held that the marina could not be subjected to a public right of access unless the government invoked its power of eminent domain and paid just compensation. *Id.* at 172, 180, 100 S.Ct. 383. While the Court opined that "the 'right to exclude[ ]' ... falls within [the] category of interests that the Government cannot take without compensation," it also stated that "[t]his is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina." *Id.* at 179–80, 100 S.Ct. 383.

In *Hodel,* a federal statute barred members of an Indian tribe from transferring highly fractionalized land holdings through intestacy or devise. 481 U.S. at 709, 107 S.Ct. 2076. The Court held that the statute had destroyed an essential stick in the bundle of property rights, *viz.,* "the right to pass on a ... small undivided interest ... to one's

heirs," a right that, "[i]n one form or another, ... has been part of the Anglo–American legal system since feudal times." *Id.* at 716, 107 S.Ct. 2076. The Court held that the abolition of both descent and devise constituted a taking. *Id.* at 718, 107 S.Ct. 2076.

Here, CCA did not become subject to a public easement, nor was its right to exclude others from its property wholly abolished. Rather, restrictions were placed on CCA's ability to remove existing tenants and approve new tenants.[22] Its right to prepay the mortgage and escape HUD regulations was abrogated; however, that alone does not require a finding that a taking has occurred. *See PruneYard,* 447 U.S. at 84, 100 S.Ct. 2035.

## B. Penn Central *Test*

Justice Black famously wrote that the Takings Clause was "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *see also Tahoe–Sierra,* 535 U.S. at 332 n. 27, 122 S.Ct. 1465 (stating that Justice Black's comment "applies to partial takings as well as total takings"). "The purpose of the takings clause is to ensure fairness, to both the property owner and the public." *Rose Acre Farms, Inc. v. United States,* 559 F.3d 1260 (Fed.Cir.2009) (citing *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563). "[I]f regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (Holmes, J.). For regulatory takings, the Supreme court " 'generally eschew[s]' any set formula for determining how far is

too far, choosing instead to engage in 'essentially ad hoc, factual inquiries.' " *Tahoe–Sierra,* 535 U.S. at 326, 122 S.Ct. 1465 (quoting *Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886). "The temptation to adopt what amount to *per se* rules in either direction must be resisted. The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context." *Id.* at 326 n. 23, 122 S.Ct. 1465 (quoting *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)); *see also Rose Acre Farms,* 559 F.3d at 1282 ("[T]here is no magic number or formula in takings cases.").

CCA's takings claim must be decided by an "inquiry into all of the relevant circumstances in [the] particular case[,]" *Tahoe–Sierra,* 535 U.S. at 334, 122 S.Ct. 1465, taking account of the principles set forth in *Penn Central* and other Supreme Court regulatory takings cases, *see Palazzolo,* 533 U.S. at 633, 121 S.Ct. 2448 (O'Connor, J., concurring), without putting undue weight on any one *Penn Central* factor. *See Rose Acre Farms,* 559 F.3d at 1282; *see also Cienega X,* 503 F.3d at 1278.

### 1. *Character of the governmental action.*

This court analyzed the character of the government's action in its prior opinion, which applied the analytical regime explicated in *Cienega VII. See CCA Assocs.,* 75 Fed. Cl. at 188–91. In *Cienega X,* the Federal Circuit did not alter or even address the application of the character factor of the *Penn Central* test. Accordingly, this court's earlier analysis on that factor is re-adopted and need not be revisited, except in one respect. The Federal Circuit this past year noted that the Supreme Court's decision in

---

**22.** In this vein, the parties have debated the application of principles that provided the basis for the Supreme Court's decision in *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). In that case, the Supreme Court upheld a California Supreme Court ruling that a privately owned shopping center that invited the public onto its premises also had to allow people to exercise their free speech and petition rights. The Court acknowledged that "there ha[d] literally been a 'taking' of [the right to exclude others]" but nonetheless engaged in a multi-factor inquiry in holding that no taking had occurred. *Id.* at 82–84, 100 S.Ct.

2035. The shopping center had "failed to demonstrate that the 'right to exclude others' [was] so essential to the use or economic value of [its] property that the state-authorized limitation of it amounted to a 'taking.' " *Id.* at 84, 100 S.Ct. 2035.

The Supreme Court in *PruneYard* also indicated that the finding of a taking in *Kaiser Aetna* did not rest solely on the government's abrogation of the right to exclude, but rather also reflected that the "creat[ion] of a public right of access to the improved pond interfered with Kaiser Aetna's 'reasonable investment backed expectations.' " *PruneYard,* 447 U.S. at 84, 100 S.Ct. 2035.

*Lingle* "altered the analytical framework ... [of] the character prong of *Penn Central.*" *Rose Acre Farms*, 559 F.3d at 1278 (citing *Lingle*, 544 U.S. 528, 125 S.Ct. 2074). In *Lingle*, the Supreme Court unanimously discarded the "substantially advances" test drawn from an earlier Supreme Court opinion which had stated that "'[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests.'" *Lingle*, 544 U.S. at 540, 125 S.Ct. 2074 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). The "substantially advances" test had been applied by lower courts as a stand-alone criterion for adjudging whether a regulatory taking had occurred. *Id.* The Supreme Court held that such a focus was more appropriate for a due process inquiry and had "no proper place in ... takings jurisprudence." *Id.* Consequently, in takings cases, the Federal Circuit instructs that "[w]e can no longer ask whether the means chosen by government advance the ends or whether the regulation chosen is effective in curing the alleged ill." *Rose Acre Farms*, 559 F.3d at 1278. Rather, "instead of looking at the rationality of the regulation, we must consider 'the actual burden imposed on property rights, or how that burden is allocated.'" *Id.* (quoting *Lingle*, 544 U.S. at 543, 125 S.Ct. 2074).

Nonetheless, the analysis in this court's prior opinion of the character of the governmental action did not rely on or even mention the "substantially advances" test. It did address the government's argument that "the preservation statutes did not have the character of a taking because they promoted an important governmental objective[,]" which argument might be understood as appealing to the "substantially advances" test. *CCA Assocs.*, 75 Fed.Cl. at 188. However, this court rejected that argument because the statutes "did not place the burden of maintaining low-income housing on all taxpayers, but instead targeted only the owners of low-income housing whose regulatory agreements included the right to prepay their mortgages after twenty years." *Id.* at 189. Accordingly, this court analyzed the character factor by considering "the actual burden imposed on property rights," and "how [that] regulatory burden [was] *distributed* among property owners." *Rose Acre Farms*, 559 F.3d at 1278. That prior analysis is fully consistent with the *Lingle* decision, and the court therefore maintains its prior analysis of the character factor as that to be applied for purposes of this decision on remand.

While the character of the government action is not such as to deliver the dispositive blow that CCA has hoped, it nonetheless weighs in favor of a finding of a regulatory taking. Rather than distributing the burden of providing subsidized housing for thousands of low- and moderate-income families on taxpayers as a whole, the preservation statutes placed the burden on CCA and other owners who were participating in the HUD programs.

### 2. *Duration of the restriction.*

In applying the *Penn Central* standards, the court must "first determine the precise scope of the benefits denied." *Id.* at 1290 (noting that "owners were not ... entirely denied the right to prepay; rather that right was denied for a short period, and rents were frozen for a period after prepayment"). "Short" is a relative term; in this instance, the denial ended up being 5 years and ten days. *See* Joint Stipulation of Facts ¶ 4 (July 14, 2009) (stipulating that the prepayment eligibility date for Chateau Cleary was May 17, 1991, and that the date on which under the HOPE Act it could convert to market-rate operation was May 27, 1996).[23]

---

**23.** The 20-year prepayment date was May 1991. The HOPE Act, enacted on March 28, 1996, ostensibly reinstated the prepayment right disabled by ELIHPA and LIHPRHA, but the subsequent HUD preservation letters precluded reliance on the HOPE Act until HUD released Preservation Letter 97-1 on December 16, 1996. *See supra*, at 588–89. The HOPE Act added a further 60-day moratorium on rent increases.

*See id.* The effective period of disallowing the prepayment right thus was 5¾ years. However, the Federal Circuit majority in *Cienega X* ruled that the period in which HUD used the preservation letters to extend the preservation statute after the enactment of the HOPE Act could not be taken into account in the takings analysis because the preservation letters were unauthorized. *See Cienega X*, 503 F.3d at 1287 n. 18.

As the Supreme Court said in *Tahoe–Sierra,* "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." 535 U.S. at 342, 122 S.Ct. 1465. In *Tahoe–Sierra,* the majority of the Supreme Court rejected the suggestion by Chief Justice Rehnquist "'that delays of six years or more should be treated as *per se* takings,'" 535 U.S. at 338 n. 34, 122 S.Ct. 1465, opining that the "'temptation to adopt what amount to *per se* rules in either direction must be resisted.'" *Id.* at 342, 122 S.Ct. 1465 (quoting *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)). The majority did comment that "[i]t may well be true that any moratorium that lasts for more than one year should be viewed with special skepticism." *Id.* at 341, 122 S.Ct. 1465. The duration of the restriction in this case was sufficiently lengthy that it weighs in favor of finding a taking, but not so heavily that it eliminates any need to evaluate other factors in the balancing process.

*3. Reasonable investment-backed expectations.*

In *Cienega X,* the Federal Circuit outlined the analysis that must be applied for the investment-backed expectations prong of the *Penn Central* analysis. First, the court should consider CCA's actual expectation. *Cienega X,* 503 F.3d at 1288. That is, did CCA subjectively rely on the prepayment provision when it invested in the property? Second, the court should consider whether that expectation was reasonable. *Id.* at 1289. As to determining the reasonableness of the expectations, the Federal Circuit explained that the court should consider whether the expectation is "investment backed." *Id.*[24] In other words, "the claimant must establish that it made the investment because of its

---

**24.** The Federal Circuit noted that "[o]ne important aspect of [the reasonableness analysis] is whether, in the regulatory environment, it would be expected that the law might change to impose liability," *Cienega X,* 503 F.3d at 1288, meaning, presumably, whether a change in the law respecting prepayment should have been anticipated. The Court of Appeals answered this question when it reaffirmed its prior holding in *Cienega VII* that "the plaintiffs could not reasonably have expected the change in regulatory approach." *Id.* at 1289 (citing *Cienega VII,* 331 F.3d at 1350).

reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits." *Id.* Accordingly, the court must determine how important the benefit allegedly taken or restricted by the government action was to the initial investment in light of the entire range of benefits the owner reasonably could have expected at the time it entered into the investment. The Court of Appeals identified two possible standards to apply in this analysis: (1) there is no taking unless the expectation was the "primary" investment-backed expectation, or (2) the expectation is "investment-backed" if an investor would not have invested "but for" the expectation, even if it is not the primary expectation. *Id.* at 1290. The court did not determine which standard should be applied, though it indicated that the "primary" standard "appears to be supported by *Penn Central." Id.; see Penn Central,* 438 U.S. at 136, 98 S.Ct. 2646 (concluding that a zoning restriction did "not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel").

(a.) The prepayment right.

The analysis of CCA's subjective expectations is straightforward. The Norman brothers originally purchased Chateau Cleary with an actual "plan[ ], expect[ation], and inten[t] to prepay the mortgage ... after twenty years." *CCA Assocs.,* 75 Fed.Cl. at 192. When CCA acquired Chateau Cleary from the Norman brothers in 1985, its "plan was the same ...—to prepay the Chateau Cleary mortgage at the twenty-year point, raise the rents to market levels, and operate the apartment complex free of HUD restrictions." *Id.* (citing 2006 Tr. 174:21 to 172:25 (Norman)).[25] Manifestly, CCA had a subjec-

---

Accordingly, this court sees no need to revisit that issue here.

**25.** CCA, in a footnote, suggests that the court should give consideration to CCA's expectations at the time it acquired its interest in the property in 1985. *See* Pl.'s Reply at 8 n. 6 (arguing that a reasonable investor in Chateau Cleary in 1985 would not have relied upon expiring tax benefits but would have relied upon prepayment rights which were just six years away). This raises the question of whether CCA's acquisition relates

tive expectation to prepay their mortgage after 20 years.

▮ In considering whether the prepayment option was the "primary" or "but-for" cause for the investment, this court first must determine the scope of the benefits denied. *See Cienega X*, 503 F.3d at 1290. The preservation statutes focused specifically on the prepayment right. In this respect, it bears reiterating that there is no evidentiary basis for concluding that CCA (and its predecessors in interest) could or should have anticipated that the prepayment right it relied upon in entering the Section 221(d)(3) program would be curtailed or forestalled. ELIHPA, discussed *supra*, placed a two-year moratorium on prepayments absent HUD approval. LIHPRHA, passed as the two-year moratorium in ELIHPA was about to expire, made the prepayment moratorium permanent, also absent HUD approval.[26] As a result, the preservation statutes had the effect of permanently depriving CCA of its ability to prepay its mortgage and escape the restrictions of the HUD regulations. Correlatively, although the HOPE statute reinstated the prepayment right in 1996, after the enactment of LIHPRHA, owners could not have anticipated that the permanent restrictions contained in LIHPRHA would be removed. Therefore, in evaluating the reasonableness of investment-backed expectations, the court will focus on the ability to prepay the mortgage after 20 years, which was permanently restricted by the enactment of the preservation statutes, although that "permanent" restriction was subsequently removed.

The court must consider the prepayment right in light of all the benefits that the plaintiff reasonably could have expected at the time of its investment. In making this determination, the court must consider "the expectations of the industry as a whole." *Cienega X*, 503 F.3d at 1290. CCA argues that the ability to prepay the mortgage after 20 years was both the "but for" and the primary expectation for the investment. Pl.'s Br. at 18. The prepayment option was touted by HUD during contract negotiations. *See CCA Assocs.*, 75 Fed.Cl. at 192 (citing 2006 Tr. 57:18 to 58:15 (Norman); *Cienega VII*, 331 F.3d at 1346–47 (the prepayment right "was one of the primary incentives HUD offered precisely to encourage [the owners'] voluntary participation in the . . . housing programs")). There is no doubt that the prepayment right was important. Moreover, the evidence shows that for CCA the prepayment right was paramount. The question arises whether other benefits were as important, judged on an objective standard for either the subsidized housing industry as a whole or for an identifiable subset of housing industry participants that included CCA. The government argues that the primary investment-backed expectations were tax benefits and subsidies arising from the ability to make a highly-leveraged investment. Def.'s Br. at 5. This argument is made generally for any and all participants in the Section 221(d)(3) and Section 236 programs.

(b.) Builder's allowance and distributions.

By entering the Section 221(d)(3) program, CCA (and its predecessor in interest) was able to make a highly leveraged financial investment in low-income housing. It was able to "borrow 90 percent of the purchase price on the basis of a forty-year amortiza-

---

back to, or is independent from, the Norman brothers' investment expectations when they purchased the property in 1969. While J. Robert Norman sold his interest in the property, his brother Ernest B. Norman, Jr., consistently maintained control over the investment. That his interest went from being a half-owner in 1985 to owner of a 62.5% partnership interest, *see* PX 33 at 2 (Transfer and Contribution to Partnership from Ernest B. Norman, Jr. to CCA (Dec. 31, 1985)), does not change the takings analysis. In all events, CCA's expectations in 1985 were not different from the Norman brothers' expectations in 1969.

**26.** Both ELIHPA and LIHPRHA required HUD approval to prepay, which required an owner to obtain the Secretary's certification that prepayment would not have adverse effects on the low-income housing stock or on current tenants. ELIHPA § 225(a), 101 Stat. at 1880; 12 U.S.C. § 4108(a)(1)(A). However, as this court found previously, prepayment was not a possibility for CCA because it did not meet the statutory criteria and therefore would not have succeeded in obtaining HUD approval. *CCA Assocs.*, 75 Fed.Cl. at 186. Notably, no property owners in the New Orleans area even applied for prepayment under the preservation statutes. *Id.* at 183.

tion period," *CCA Assocs.*, 75 Fed.Cl. at 173 (citing 12 U.S.C. § 17151 (d)(3)(iii), (*i*)(2)(A)(iv); 2006 Tr. 1161:3–6 (Test. of Kenneth Malek, a tax accountant called to testify as an expert by the government)), and was also "given a Builder's and Sponsor's Profit and Risk Allowance ("Builder's Allowance") that, when coupled with the loan, typically reduced an investor's initial cash outlay to 1.5 to 3 percent of the cost of the project." *Id.* (citing 2006 Tr. 1160:12–19 (Malek)).[27] Additionally, the government provided an interest-rate subsidy for the Chateau Cleary project which put the actual loan rate at 3 percent rather than the 7 percent market rate at the time. *See* 2006 Tr. 1162:24 to 1164:4 (Malek) (opining that the interest subsidy was largely offset by the requirement to charge lower rents to tenants, but that owners of subsidized housing had reduced risk because a steady supply of tenants was more likely).

For this leveraged and subsidized investment, CCA was entitled under the regulatory agreement to extract an annual cash distribution, or cash dividend, from the Chateau Cleary project, to the extent such a dividend or distribution was earned and available.

DX 1 at 3 (Regulatory Agreement).[28] This dividend was limited to six percent of the owner's equity in a project, and could only be paid out of "surplus cash." *Id.;* 2006 Tr. 1172:13–25 (Malek). If the distribution was not paid in any year, it was carried into the next year. DX 1 at 3 (Regulatory Agreement). The owner's equity included both the owner's cash outlay and the Builder's Allowance. *See* 2006 Tr. 1173:5–19 (Malek).[29]

Mr. Malek suggested that the low distribution rate allowed was matched economically by the risk associated with the projects. He considered that these housing projects entailed a "very low risk" for developers because they involved low initial capital, a low interest rate, and "a ready supply of tenants." 2006 Tr. 1163:22 to 1164:12 (Malek); *see also* 2006 Tr. 420:5–14 (Norman) (acknowledging that one advantage a HUD development had over conventional real estate was that "there is some less risk in the first 20 years because you ... [are] more likely to have a lower vacancy rate. You are not subject generally to the vagaries of fluctuations, certain economic fluctuations because there are more people of low and moderate income means than there are people of high-

---

**27.** Project developers were awarded a Builder's Allowance as a credit for their work in preparing and developing the project, which work required the expenditure of time and preparatory costs. *See* 2006 Tr. 93:10 to 94:14 (Norman) (describing the Builder's Allowance as something they worked for, earned, and essentially put back into the project, as they would in developing a conventional complex). Their work to earn the Builder's Allowance reflects a real economic investment and, like any start-up cost, represented an essential outlay of resources that should not be ignored in evaluating returns on an investment.

**28.** Owners shall not without the prior written approval of the Commissioner:

...

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except from "surplus cash" and except on the following conditions:
(1) All distributions shall be made only as of or after the end of a semi-annual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, as determined by the Commissioner; and the right to such distribution shall be cumulative.

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;
(3) Any distribution or any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds;
(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.
DX 1 at 3 (Regulatory Agreement).

**29.** The Builder's Allowance represented ten percent of the project cost exclusive of the land, or approximately 7 to 8.5 percent of the total project. *See* 2006 Tr. 1161:8–16, 1166:7–11 (Malek). Because the 6% distribution was calculated from the total owner's equity rather than just the owner's cash contribution, Mr. Malek considered that it represented between a 20 and 40 percent return on the owner's cash contribution. *See* 2006 Tr. 1162:3–12 (Malek). Mr. Malek did not assign any cost to the Builder's Allowance. CCA's cash contribution represented approximately 2.7% of the Chateau Cleary project. *See* 2006 Tr. 1168:12 to 1169:2 (Malek).

er means, so you generally have a larger segment of society to serve, which is an advantage.").

In actuality, the projects entailed considerable risk. Rental income was subject to regulatory risk because HUD might not timely approve rental increases to correspond to inflation. Projects were also not immune from general economic declines in the local area, which might reduce the availability of jobs and thus induce population migration. Neighborhoods also could decline. Moreover, the annual cash dividend was only a possibility, not a guarantee. It operated as a cap, limiting the amount of profits an owner could realize. Payment of the distribution was dependent on the owner's having surplus cash for the year in excess of the requisite cash reserve fund. *See supra*, at 587 n. 8 (describing the mandatory reserve funds).

The inherent risk involved in these projects is apparent when one considers that many projects struggled to stay afloat, *see, e.g., City Line Joint Venture*, 503 F.3d at 1321 (describing how an owner of a Section 221(d)(3) project ran into financial difficulties and defaulted on its loan), while others failed completely, including a number in the New Orleans area. *See* 2006 Tr. 502:18 to 503:3 (Alexander). Mr. Alexander was the Director of Community Planning and Development Division in the New Orleans office of HUD, and he indicated that much of his time was spent on problem projects that were in default. *Id.; see also* 2006 Tr. 515:10–13 (Alexander) (testifying about a HUD training program instituted in response to "many defaults across the country"). The court does not have before it any quantitative analysis of the failure rate of HUD projects; however, it seems apparent that the projects could not be classified as "very low risk" or even "low risk."

The cash distributions did not prove to be of significant benefit to CCA and its predecessors in interest; from the outset of the

investment in 1971, they did not take out a cash distribution until 1983. *See* PX 26 at 14 (Chateau Cleary Financial Statement for Fiscal Year 1983) (indicating a cash distribution of $8,521 from an accumulated and unpaid total of $159,855). Through 1990, CCA had taken distributions totaling $112,692,[30] while its potential distributions were $259,040.[31] In short, CCA received less than half of the potential amount it could receive. 2006 Tr. 154:21 to 155:10 (Norman). Mr. Norman attributed the inability to receive the full cash distributions to HUD delays in approving rent increases and rising costs. 2006 Tr. 331:11 to 332:9 (Norman); *see also* 2006 Tr. 337:5 to 338:8 (Norman) (explaining that when CCA petitioned HUD for a rent increase to capture accumulated dividends, HUD insisted the rent increase had to be spread over several years, thus delaying capture of those dividends).

CCA did not consider the cash distribution to be significant. "It was nice, but it was not something that made much difference." 2006 Tr. 93:5–9 (Norman). The distribution was dependant on keeping the property occupied, obtaining rent increases, and limiting costs. Mr. Norman testified that the limited dividend was not typically available "[b]ecause we were playing catch-up [with costs]. It just-we never caught up. And also if we did have extra cash and had discretionary cash, things were running so tight, we would put it back in the property rather than try to force a surplus cash." 2006 Tr. 158:22 to 159:9 (Norman). A recession in 1986, especially affecting the local petroleum industry, affected the rental market and made cash distributions even more difficult. *See* 2006 Tr. 155:15 to 156:12 (Norman).

The evidence thus shows that the ability to make a leveraged investment because of a Builder's Allowance and the option to receive some return on equity through cash distributions were benefits that constituted incentives, but not significant ones, for CCA to enter the program. *See* 2006 Tr. 417:6–17

---

**30.** CCA took a distribution of $8,521 in 1983, PX 26 at 14, $61,141 in 1984, PX 27 at 15, $35,578 in 1985, PX 32 at 14, and $7,452 in 1988. PX 36 at 15.

**31.** CCA accrued a potential annual distribution of $12,952 each year. *See, e.g.,* PX 36 at 5 (Chateau Cleary Financial Statement for 1988, noting provision for owner's return on equity investment to be 6% of $215,863, or $12,952).

(Norman). Notably, the government's opinion evidence presented by its testifying expert, Mr. Malek, also supports the conclusion that the Builder's Allowance and potential cash distributions were not the primary bases for investment expectations in the industry. *See* 2009 Tr. 179:19–24 (Malek) (syndication prospectuses tout cash distributions as a secondary benefit to investing, after tax benefits).

(c.) Tax benefits.

The government puts more emphasis on tax benefits as a primary driver of investment in subsidized housing projects, arguing that "tax benefits were the primary economic return that would be expected from an investment in a[S]ection 221(d)(3) project and were far greater than the tax benefits for comparable conventional projects." Def.'s Br. at 5. The government's expert opined that the tax benefits were "close to the raison d['être]" for investing in the HUD program. 2006 Tr. 1182:2–6 (Malek). A 1972 guide to low– and moderate-income housing stated that "[o]ne of the principal benefits of ownership of a federally assisted housing project is the tax shelter that it generates." Charles L. Edson & Bruce S. Lane, Bureau of National Affairs, Inc., *A Practical Guide to Low– and Moderate–Income Housing* 11:6 (student ed. 1972) (DX 176 at 8); *see also id.* at 10:1 ("Accelerated depreciation, the high leverage available . . ., and the possibility of favorable capital gains treatment have all combined to create a tax shelter which is quickly becoming a center of attention in the investment community.") (DX 210 at 55).

The tax benefit cited by Mr. Malek was the ability of a property owner to take accelerated depreciation of the building and use that depreciation as a deduction to offset other income, including earned income. *See* 2006 Tr. 1174:15 to 1176:1 (Malek). The relevant tax laws applied equally and without distinction or difference to both conventional and subsidized buildings. 2006 Tr. 1182:10–18 (Malek). The reason the tax benefits were potentially more advantageous for owners in the HUD programs was because of the proportionately lower initial cash investment, which gave the equity owner more leverage.

2006 Tr. 1164:22 to 1165:2 (Malek). Owners could take advantage of this accelerated depreciation in one of two ways: either they could use the depreciation for their own benefit to offset gains, or they could "syndicate" a part of their ownership interest, which involved packaging and selling ownership interests, thereby conveying tax benefits as a tax shelter for purchasing investors, cashing out the initial owner from the portion of the ownership interest which was syndicated. *See* 2006 Tr. 1158:14 to 1159:19 (Malek).

CCA did not realize any such "benefit." It did not take accelerated depreciation, and it did not syndicate any of the equity ownership interest. 2006 Tr. 92:9–11, 23–25 (Norman). Mr. Malek testified that CCA, although it did not use accelerated depreciation, achieved some benefit by using component depreciation, with different components of the building being accorded different life spans for purposes of depreciation. *See* 2006 Tr. 1178:8–18, 1180:10 to 1181:24 (Malek). Component depreciation, combined with leveraging, would have enabled CCA to obtain a less aggressive, more conservative tax benefit. *See* 2006 Tr. 1183:9–15 (Malek). Accelerated depreciation, inherently by its nature, throws off greater tax benefits in the early years, but it eventually generates a tax detriment later, with the tipping point ordinarily coming between years 19 and 22. *See* 2006 Tr. 1270:18 to 1273:10 (Malek). Accelerated depreciation as a result was favored for syndication to purchasers who wanted a short-term shelter for ordinary income and were not interested in long-term benefits.

Some HUD projects employed syndication. *See* 2006 Tr. 1177:4–5 (Malek). The government at the 2009 trial submitted six prospectuses of properties that were syndicated. *See* DX 200–205. These prospectuses were private placement memoranda, "investment[-]offering circular[s] that [were] designed to provide information to potential investors that would allow them to make an informed decision regarding the benefits or risks and merits of an investment in [the] project." 2009 Tr. 165:23 to 166:3 (Malek). They represented four properties in Massa-

chusetts, *see* DX 200, 201, 202, 203,[32] one in California, *see* DX 204, and one in Minnesota, *see* DX 205.[33] The prospectuses described the potential benefits for investing in the projects as being primarily tax benefits and secondarily cash distributions. *See, e.g.,* 2009 Tr. 179:19–24 (Malek) (referencing a prospectus for Cromwell Court, DX–201). The prospectuses do not assign any weight to the ability to prepay after 20 years as a reason to invest, with most dismissing the possible net proceeds from prepayment after 20 years at a nominal value of one dollar, *see, e.g.,* 2009 Tr. 180:6–12 (Malek) (citing the prospectus for Cromwell Court, DX–201), although one of the six prospectuses made no projections after 20 years. *See* 2009 Tr. 197:9–24 (Malek) (citing the prospectus for Chancellor Manor, DX 205).

However, the details of the prospectuses indicate that the possibility of prepaying the mortgage after 20 years and of realizing an increase in equity was a considerable benefit. For instance, the general partners for the Chauncy House Company sold 95% of the profits, losses, and cash flow of the project to the investing limited partners, but retained 50% of residual proceeds from a refinancing, sale, or other disposition of the project. DX 203 at 6. Similarly, the general partners in the Skyline View Gardens project sold 95% of the profits, losses, and cash flow of the project to the limited partners, but retained 35% of "residual proceeds from the sale, other disposition or refinancing of the Project." DX 204 at iv–v. For the Chancellor Manor project, if a "sale, refinancing, condemnation, or casualty" occurred after 17 years, then the limited partners received only 50% of the proceeds once their initial capital contribution had been returned. DX 205 at 21–23. The limited partners in Chan-

cellor Manor were allocated 100% of all profits and losses for the first five years of the project, and 96½% of profits and losses thereafter, subject to the post–17–year reallocation of 50% to the general partner. *Id.* These reallocation provisions suggest that the general partners in three of the six instances were willing to sell short-term tax benefits and dividends but wanted to retain a significant portion of the long-term benefits from property appreciation, particularly those following the prepayment date.

The evidence as to syndication does not indicate how common it was for participants in the HUD programs to syndicate. Mr. Malek testified that a number of Section 221(d)(3) and Section 236 projects were syndicated through private placement memoranda, 2009 Tr. 178:2–7 (Malek), but he offered no quantitative indicia of the practice. The court is left with the understanding that syndication was not unusual but that the majority of initial owners did not syndicate their ownership, and also those that did syndicate often retained an enhanced interest in the long-term proceeds, *i.e.,* those that might arise after 20 years when prepayment could occur.[34]

Significantly, the evidence at trial showed that investment expectations varied between projects roughly grouped into two types— those built in areas where development or neighborhood-enhancement was projected and those built in areas that were economically depressed or not expected to show significant improvement over time. Mr. Malek claimed that the returns of a typical private placement memorandum did not depend on the project's locus (development area) or character (*i.e.,* the quality of construction, type of amenities provided, etc.). *See* 2009

---

**32.** A cottage industry for syndication was based in Boston. *See* 2009 Tr. 195:11–13 (Malek).

**33.** The court assumes that each of these prospectuses resulted in a completed transaction.

**34.** This court has held trials involving sixteen properties under the HUD programs, of which three appear to have been syndicated. *See Cienega IX,* 67 Fed.Cl. at 446–57, *vacated and remanded by Cienega X,* 503 F.3d 1266 (two syndicated properties, six non-syndicated properties in the *Cienega* set of plaintiffs, and one syndicated

property in the *Chancellor Manor* set of three properties); *Independence Park Apts.,* 61 Fed.Cl. at 696 (four non-syndicated properties); 2006 Tr. 92:9–11 (Norman) (ownership of CCA not syndicated). Sixteen is too small a sample size from which to extrapolate a percentage for the universe of participants in the Section 221(d)(3) and Section 236 programs, although the resulting proportion of properties syndicated in the cases before the court—three of sixteen—does provide some indication that syndication was not the norm.

Tr. 169:13–16 (Malek). But in the instance of Chateau Cleary, the potential returns very much depended on its geographical location. "[T]he Norman Brothers chose ... to invest in a property in West Metairie, then considered to be in the path of future development in the New Orleans area and an emerging middle-class neighborhood." *CCA Assocs.*, 75 Fed.Cl. at 192. The reasonableness of this projection was confirmed by the development of West Metairie, as evident from a site visit in 2006. *Id.* at 193. CCA became involved with, and did not syndicate, Chateau Cleary because it wanted to retain the benefits to be gained after prepaying the mortgage in the 20th year. *See* 2006 Tr. 92:13–22 (Norman). CCA's long-term business plan probably would not be reasonable for a property located in an economically depressed area that offered little, if any, opportunity for future appreciation. From the evidence, because housing projects are not homogenous, it is possible for different projects to have divergent, yet nonetheless reasonable, investment expectations. As this court stated in *Cienega IX*,

> There is not one magical, reasonable set of expectations that a business could have; hundreds of business plans could be deemed reasonable. For example, the Blossom Hill and Skyline View partnerships chose to syndicate limited partnership interests, while other partnerships whose properties were managed by G & K Management did not. Similarly, although both the *Cienega Gardens* and *Chancellor Manor* sets of plaintiffs implemented a strong "buy and hold" strategy, the *Cienega Gardens*-related set planned to borrow more heavily against the properties, while the *Chancellor Manor* set planned to refinance with very small, seven to ten-year, fully-amortizing mortgages in the interests of having "as little debt as possible." In fact, by the time of trial, Oak Grove had already paid its conventional mortgage and was operating as a conventional property on a debt-free basis. Because such a wide range of business expectations and plans could be deemed reasonable, it is important to determine what plaintiffs expected and then determine whether that baseline was reasonable.

*Cienega IX,* 67 Fed.Cl. at 473 n. 47 (internal quotation marks omitted) (citations omitted). In short, factors associated with the location and character of projects strongly influenced the reasonable expectations of the owners, judged on an objective and not a subjective basis.

Reliance on tax benefits involved a short-term focus for the reasons explained earlier, and it also entailed greater risk, being dependent on provisions in the tax code that applied to both conventional and subsidized properties and that could change at any time. In fact, when the tax code did change in 1986, some of the syndicated investments went into foreclosure because the depreciation that remained available by that date was a passive item, deductible only to the extent of passive income, and could no longer be used to offset earned income. *See* 2009 Tr. 222:6–22 (Malek).

The evidence thus shows that it is not possible to derive investment expectations of participants in the Section 221(d)(3) and Section 236 programs as a whole. To reiterate, a 1972 guide to low– and moderate-income housing stated that "[o]ne of the principal benefits of ownership of a federally assisted housing project is the tax shelter that it generates." Edson & Lane, at 11:6. Yet, in a section summarizing the advantages of obtaining a limited partnership interest in federally assisted projects, the guide also states, "[w]here a project is located in a growing suburban or exurban area, it may increase in value over the years, thus creating substantial residual profits to the investors upon sale or other disposition." *Id.* at 11:8. CCA's Chateau Cleary project falls into this latter category where the prospect of long-term appreciation was the chief incentive and thus the prepayment right was critically important.

(d.) "Primary" and "but-for" test.

Having considered the potential investment expectations for CCA and the two general types of projects into which participants in the Section 221(d)(3) and Section 236 programs can be classified, the court must address whether CCA has established that it

"made the investment because of its reasonable expectation of [prepaying the mortgage after 20 years, which ability was curtailed by the preservation statutes,] rather than the remaining benefits." *Cienega X,* 503 F.3d at 1289. As noted earlier, the Federal Circuit suggested two possible standards: the "primary" benefit standard, and the "but-for" benefit standard. CCA asserts that they have met both standards, *see* Pl.'s Br. at 17–18, while the government contends that CCA has met neither. *See* Def.'s Br. at 41–42.

*Penn Central* constitutes ambiguous support for a "primary" expectation rule. The statement that the regulation "does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel" is made in the context of a broader analysis of "the severity of the impact of the law." *Penn Central,* 438 U.S. at 136, 98 S.Ct. 2646. And creation of a primary-expectation rule would seem to run counter to the Supreme Court's statements about the *Penn Central* test because the Supreme Court has been notably reluctant to establish special rules for regulatory takings cases, and a "primary" expectation rule would impose heightened evidentiary burdens on a plaintiff. *See, e.g., Tahoe–Sierra,* 535 U.S. at 326 n. 23, 122 S.Ct. 1465 (quoting *Palazzolo,* 533 U.S. at 636, 121 S.Ct. 2448 (O'Connor, J., concurring)) ("The temptation to adopt what amount to *per se* rules in either direction must be resisted. The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context."); *see also Rose Acre Farms,* 559 F.3d at 1282 ("[T]here is no magic number or formula in takings cases."). The "but-for" test reflects generally applicable concepts of causation, *see Mittal Steel Point Lisas Ltd. v. United States,* 542 F.3d 867, 876 (Fed.Cir.2008) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 240, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)), and is not peculiar to takings jurisprudence. Nonetheless, this court "need not determine ... whether the reason for the investment must be the 'primary' expectation or simply that reasonable owners would not have invested 'but for' the expectation," *Cienega X,* 503 F.3d at 1290, for CCA has satisfied both standards.

CCA has set forth sufficient facts to establish that the 20–year prepayment option was the primary expectation underlying the decision by the Norman brothers to invest in the HUD program. "The prepayment right was the *sine qua non* of the deal," *CCA Assocs.,* 75 Fed.Cl. at 199, and the Norman brothers "wouldn't have done [the deal] without it." 2006 Tr. 91:22–25 (Norman). CCA had a long-term strategy based on Chateau Cleary's location. CCA invested in a property they considered to be "located in a growing suburban or exurban area" that they hoped would "increase in value over the years" and "creat[e] substantial residual profits ... upon sale or other disposition." Edson & Lane, at 11:8. Subsequent events have born out CCA's investment strategy, as growth has come to the area. Chateau Cleary was recently appraised at approximately $5 million. 2009 Tr. 46:1–12 (Norman).

The government has sought to establish that industry-wide expectations were primarily focused on short-term potential tax benefits, with capped distributions as secondary benefits. They have established that these expectations were probably principal ones for a class of investors in HUD's Section 221(d)(3) and Section 236 programs. However, evidence shows that these investment expectations would not have been those primarily held by another class of investors in those programs—those interested primarily in long-term enhancement. Chateau Cleary was similar to properties where long-term results, not short-term gains, were the basis of the owners' expectations.

In sum, CCA had an objectively reasonable, investment-backed expectation with respect to the right to prepay. That expectation constituted the "but for" and "primary" reason for CCA to develop and operate Chateau Cleary.

*4. Economic impact.*

■ The third factor of the *Penn Central* analysis examines the severity of the economic impact of the regulation on the property owner, *see Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, and involves a "weigh[ing of] all the relevant considerations." *Yancey v.*

*United States,* 915 F.2d 1534, 1541 (Fed.Cir. 1990). Although courts must determine whether the plaintiff has suffered a "serious financial loss," *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir. 1994), there is no "magic number" below which compensation must be denied. *Rose Acre Farms,* 559 F.3d at 1282; *see also Yancey,* 915 F.2d at 1541 (no "automatic numerical barrier").

In its prior decision, this court calculated economic impact for the period the prepayment right was extinguished as a measure of CCA's return on equity under the preservation statutes in comparison to the return on equity that it would have received but for the statutes. *See CCA Assocs.,* 75 Fed.Cl. at 195. This approach had been used by the Federal Circuit in *Cienega VII. See* 331 F.3d at 1342–45. Following the lead of *Cienega VII,* this court in its initial decision concluded that under such a calculation, CCA suffered an 81.25% diminution in return on equity due to ELIHPA and LIHPRHA, which constituted a "serious financial loss." *CCA Assocs.,* 75 Fed.Cl. at 199 (quotation omitted).[35] This court used the same return-on-equity approach in calculating economic impact in the *Cienega IX* case. *See Cienega IX,* 67 Fed.Cl. at 474–79. However, the Federal Circuit's decision in *Cienega X* vacating and remanding that decision criticized this mode of calculating economic impact. The Court of Appeals considered that the economic impact of the termination of the prepayment right had to be evaluated on the value of the project as a whole, *i.e.,* comparing the economic detriment during the period the prepayment right was disabled to the ability of the project to generate income over its entire useful life. *Cienega X,* 503 F.3d at 1280. The Court of Appeals also indicated that LIHPRHA's offsetting benefits should be taken into account. *Id.* at 1282–83. As instructed, the remand in this case will proceed "in accordance with

*Cienega X." CCA Assocs.,* 284 Fed.Appx. at 811.

(a.) Parcel as a whole.

In temporary taking cases, the courts ordinarily have looked to rental value or other equivalent measures of non-permanent use. *See United States v. Pewee Coal Co.,* 341 U.S. 114, 115, 117–18, 119, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (Black, J., writing for the plurality) (Reed, J., concurring in the judgment) (upholding award of just compensation to owner of a coal mine that the government had occupied and operated for over five months); *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 16, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) (referring to "the record of its past earnings" and holding that the "proper measure of compensation [for a temporary taking] is the rental that probably could have been obtained"); *United States v. General Motors Corp.,* 323 U.S. 373, 379–83, 65 S.Ct. 357, 89 L.Ed. 311 (1945). In the *Pewee Coal* case, Justice Reed, concurring in the judgment, and casting the vote that established a majority for the judgment, contrasted this focus on lost returns of revenue with the method that compared a change in market value:

> Market value, despite its difficulties, provides a fairly acceptable test for just compensation when the property is taken absolutely. But in the temporary taking of operating properties, market value is too uncertain a measure to have any practical significance.... The most reasonable solution is to award compensation to the owner as determined by a court under all the circumstances of the particular case.

341 U.S. at 119–120, 71 S.Ct. 670 (Reed, J., concurring) (internal citations omitted) (emphasis added).

In *Cienega X,* the Federal Circuit distinguished *Kimball Laundry* as inapplicable be-

---

35. The court accepted and adopted the calculations performed by Dr. Wade R. Ragas, an economist and real estate expert called to testify by CCA. Dr. Ragas divided the maximum HUD-allowed annual dividend, $12,925, by the aggregate equity in the property at the time of prepayment, $811,700, giving CCA a 1.6% return on its equity. *CCA Assocs.,* 75 Fed.Cl. at 198 (citations omitted). "Comparing this 1.6% return to a conservative 8.5% return on 15–year mortgage-backed securities, the comparative benchmark used in *Cienega VII,* yields an economic impact of 81.25%." *Id.* (citations omitted). This calculation actually undervalued the economic impact because it was based on the maximum possible annual return fixed by HUD, and not CCA's actual returns. *Id.*

cause it was a physical takings case, not a regulatory takings case, and because the economic analysis in that case was performed in the context of determining just compensation, not whether a taking had occurred. 503 F.3d at 1281–82. Instead, the Court of Appeals required that the economic detriment attributable to the temporary restriction of the prepayment right be compared to the value of the property as a whole because plaintiffs are required to show "severe economic deprivation" in a regulatory taking case, whether the case addresses a temporary or a permanent restriction. *Id.* In reaching this conclusion, the Federal Circuit relied on the Supreme Court's *Tahoe–Sierra* decision. *Id.* at 1281. In *Tahoe–Sierra,* the Supreme Court considered whether a temporary development moratorium constituted a regulatory deprivation of "all economically beneficial uses" of land such that the *Lucas* categorical takings rule applied, or whether the court should instead apply a *Penn Central* analysis. 535 U.S. at 330, 122 S.Ct. 1465 (citing *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886). The petitioners argued that the moratorium on building was a *per se* regulatory taking because there was a complete taking of development rights during a thirty-two-month period. The Supreme Court rejected this argument:

> Of course, defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings. Petitioners' "conceptual severance" argument is unavailing because it ignores *Penn Central's* admonition that in regulatory takings cases we must focus on "the parcel as a whole."

*Id.* at 331, 122 S.Ct. 1465. Based upon these observations, the Federal Circuit concluded that "in a temporary regulatory takings analysis context the impact on the value of the

property as a whole is an important consideration, just as it is in the context of a permanent regulatory taking." *Cienega X,* 503 F.3d at 1281.

The Federal Circuit proposed two possible ways "to compare the value of the restriction to the value of the property as a whole." *Cienega X,* 503 F.3d at 1282.

> First, a comparison could be made between the market value of the property with and without the restrictions on the date that the restriction began (the change in value approach). The other approach is to compare the lost net income due to the restriction (discounted to present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value).

*Id.* The Federal Circuit instructed the court to consider these two measures "as well as any other possible approaches that determine the economic impact of the regulation on the value of the property as a whole." *Id.*

The parties did not present evidence at trial that would enable the court to apply the second measure. Although there is evidence of the "lost net income due to the restriction,"[36] there is no evidence as to "the total net income without the restriction over the entire useful life of the property." *Cienega X,* 503 F.3d at 1282. Instead, the parties in this case entered into a joint stipulation as to the first calculation:

> CCA suffered an economic impact of 18 percent as a result of ELIHPA and LIHPRHA (the "Preservation Statutes") if one does not consider any statutory benefits conferred by the Preservation Statutes and compares (i) the market value of Chateau Cleary on its prepayment eligibility date of May 17, 1991, assuming that CCA could have prepaid and converted to market-rate operations immediately on this date, and

**36.** CCA's lost net income due to the preservation statutes is $714,430, calculated as of May 1996, when the 60-day moratorium on rent increases enacted by HOPE ended. *See* PX 106 at 48 (Second Ragas Report); *see also CCA Assocs.,* 75 Fed.Cl. at 204 (calculating lost rents through February 1997 as $841,839); Pl.'s Br. at 47–48. As noted previously, in *Cienega X,* the Federal

Circuit majority ruled that the period in which HUD used the preservation letters to extend the effect of the preservation statutes after the enactment of the HOPE Act could not be taken into account in the takings analysis because the preservation letters were unauthorized. *See Cienega X,* 503 F.3d at 1287 n. 18.

(ii) the market value of Chateau Cleary on its prepayment eligibility date assuming that the property would remain in the Section 221(d)(3) program until May 27, 1996, at which point it would convert to market-rate operation.

Joint Stipulation of Facts ¶ 4 (July 14, 2009). CCA argues that this is the correct measure of economic impact under *Cienega X*, though it disagrees with that decision. *See* Pl.'s Br. at 23, n. 15. The government agrees with the calculation, but contends that there are statutory benefits conferred by the preservation statutes that reduce the economic impact and shorten the relevant time period. *See* Def.'s Br. at 29–30.

(b.) Offsetting benefits.

■ The Federal Circuit's decision in *Cienega X* calls upon this court to consider any offsetting benefits from the preservation statutes "which were specifically designed to ameliorate the impact of the prepayment restrictions." 503 F.3d at 1283. That aspect of *Cienega X* overturned the approach applied by this court in *Cienega IX* and *CCA Associates*, which held that offsetting benefits did not affect the *Penn Central* takings analysis, but rather should be addressed in the determination of just compensation. *See Cienega IX*, 67 Fed.Cl. at 470; *CCA Assocs.*, 75 Fed.Cl. at 198.[37]

The government asserts that CCA bears the burden of proof to establish the economic impact of any offsetting statutory benefits. *See* Def.'s Br. at 30–31. CCA demurs, contending that the government has the burden in this regard. Pl.'s Reply at 13. CCA undoubtedly has the burden of proof on each of the *Penn Central* factors, including that of economic impact. *See Cienega X*, 503 F.3d at 1288. However, the government's contention reaches too far and is not accepted. Once CCA has established the economic im-

---

**37.** In *Cienega IX*, the court reasoned that considering offsetting benefits in the takings analysis could enable the government to "evade paying the constitutionally-required just compensation" by paying "forty, or fifty, or sixty cents on the dollar." 67 Fed.Cl. at 470. "The government's argument, if accepted, ... would enable the government to take property with impunity, so long as it offered a modicum of recompense by statutory action." *Id.* The court distinguished between "value provided by extrinsic means, as, for example, by statutory options that previously did not inhere in and with the property," which should only be taken into account in computing just compensation, and "any residual value of the property itself, which would be considered during the economic-impact portion of the takings analysis." *Id.*

The Federal Circuit relied on *Penn Central* in holding that "offsetting benefits must be accounted for as part of the takings analysis itself." *Cienega X*, 503 F.3d at 1283. In *Penn Central*, the appellants' air development rights had been restricted at their Penn Central Terminal property, but were transferrable to other parcels in the vicinity. *Id.* (citing *Penn Central*, 438 U.S. at 113–14, 98 S.Ct. 2646). "[T]hese benefits 'undoubtedly mitigate whatever financial burdens the law has imposed on appellants and, for that reason, are to be taken into account in considering the impact of the regulation.'" *Id.* (quoting *Penn Central*, 438 U.S. at 113–14, 98 S.Ct. 2646).

The Federal Circuit distinguished the *Whitney Benefits* cases upon which this court had relied, which disregarded offsetting benefits in the takings analysis. *Cienega X*, 503 F.3d at 1283 (citing *Whitney Benefits*, 926 F.2d 1169, and *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed.Cir.1985)). In *Whitney Benefits*, the government offset mining restrictions on land owners by authorizing the sale or lease of other federal land to the owners. *Id.* "[T]he value of the new property offered in exchange for the restriction could not be considered under the takings analysis because 'the exchange transaction is a method of ascertaining and paying just compensation for a taking, which may be negotiated and agreed upon either before or after the taking itself, and is optional with the claimants.'" *Id.* (quoting *Whitney Benefits*, 926 F.2d at 1175). The Federal Circuit distinguished this situation from *Penn Central* because "in *Whitney Benefits* the government offered those parties *new* properties," whereas in *Penn Central* "the benefits were tied to the property already owned." *Id.*

The Federal Circuit's distinction potentially permits the government to take property by regulation and escape paying just compensation by providing offsetting benefits "tied to the property." *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 748, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (Scalia, J., concurring) ("If money that the government-regulator gives to the landowner can be counted on the question of whether there *is* a taking (causing the courts to say that the land retains substantial value, and has thus not been taken), rather than on the question of whether the compensation for the taking is adequate, the government can get away with paying much less."). Moreover, in *Penn Central*, the offsetting benefits applied wholly apart from any choice made by the property owner, whereas in this instance, as in *Whitney Benefits*, any offset applied only for those property owners who chose to seek one of the options and to forego waiting for the restrictions to end.

pact of the restriction in question, the burden is on the government to show that other statutory benefits should offset that impact. *See Rose Acre Farms*, 559 F.3d at 1275 (refusing to consider offsetting economic benefits because "the government points to no economic data in the record to support its assertion of offsetting benefits"); *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1175 (Fed.Cir.1991) (rejecting the government's argument that a coal exchange should be considered in assessing economic impact). To hold otherwise would require CCA to prove a negative—to prove that nothing else in the statute could provide any offsetting economic benefit.

 The government offers proof of a benefit that could be obtained under one, and only one, of the several options that ELIHPA and LIHPRHA made available to owners whose prepayment rights were restricted. Def.'s Br. at 30. Specifically, the government contends that CCA had the option to sell the property at market value under both ELIHPA and LIHPRHA. Def.'s Br. at 30.[38] The government's calculation of a potential sale benefit is based on three assumptions: first, that "CCA could have found a buyer for the property;" second, that "HUD would provide the funding to facilitate [such a] sale[;]" and third, that "if CCA diligently pursued the sale process, a sale would have been completed by November 1992." Def.'s Br. at 33 (citing 2009 Tr. 246:22 to 247:5 (Test. of Dr. Bret Dickey, an economic consultant called to testify as an expert by the government)).

By arguing that CCA could have completed a sale by November 1992, the government necessarily contends that CCA could have proceeded with a sale under ELIHPA rather than LIHPRHA. Under ELIHPA, an owner was permitted to file a notice of intent to prepay or to seek incentives, including a sale, up to one year before its prepayment eligibility date. *See* ELIHPA § 232(2). Regulations implementing ELIHPA took effect in May 1988. *See* Prepayment of a HUD–Insured Mortgage by an Owner of Low Income Housing, 53 Fed.Reg. 11,224, 11,229 (Apr. 5, 1988); 24 C.F.R. § 248.231(g) (1991). CCA thus could have filed a notice of intent in May 1990, a year before its prepayment date. *See* 2009 Tr. 248:1–11 (Dickey). HUD would then provide the owner with information as to how to prepare a plan of action, including information as to possible incentives. 24 C.F.R. § 248.211 (1991). Mr. Kevin East, Chief of the Affordable Housing Branch of HUD during the 1990s, testified that the sale process under ELIHPA in the years 1991 and 1992 typically took between 15 and 18 months, *see* 2009 Tr. 135:14–17 (East), and Dr. Dickey used an estimate of two-and-a-half years to arrive at an estimated sale completion date of November 1992. The provisions of LIHPRHA would not come into play because regulations implementing LIHPRHA were not adopted until April 1992. *See* 24 C.F.R. § 248 Subpart B (1993); Prepayment of a HUD–Insured Mortgage by an Owner of Low–Income Housing, 57 Fed.Reg. 11,992, 12,041 (Apr. 8, 1992).[39] Therefore, to adopt Dr. Dickey's estimate, this court must find that it was probable that CCA could have pursued a sale and have successfully sold the property under ELIHPA if it had sought to do so.

The parties disagree as to whether a sale option existed under ELIHPA. *Compare* Pl.'s Br. at 29–30 (arguing that ELIHPA and its accompanying regulations do not specify a

---

38. The other major option under ELIHPA or LIHPRHA consisted of entering into a use agreement to maintain the property as low-income housing for an extended period of time. The government did not adduce evidence of benefits attributable to this option. Evidence in the record shows that entry by HUD into a use agreement depended on HUD obtaining the necessary funding from Congress. At least three properties in the New Orleans area sought such incentives and were approved, but could not proceed due to a lack of funding. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.).

39. Following the passage of LIHPRHA, CCA filed a notice of intent with HUD in December 1990 to preserve its options under ELIHPA and LIHPRHA. PX 42 (CCA Notice of Intent (Dec. 28, 1990)). In June 1992, CCA filed a notice of election to proceed under ELIHPA, while reserving its rights to proceed under LIHPRHA. PX 51 (CCA Notice of Election to Proceed (June 8, 1992)). A plan of action could not be filed under LIHPRHA until after the regulations were published on April 8, 1992. *See* 2009 Tr. 151:19–23 (East).

process or procedure for achieving a sale), *with* Def.'s Br. at 31 (arguing that ELIHPA provided for a sale option). ELIHPA lists a number of incentives for owners to extend low income use, but it did not include a sale option among those optional incentives. Rather, it authorized the Secretary of HUD to take "[o]ther actions, *authorized in other provisions of law*, to facilitate a transfer or sale of the project to a qualified nonprofit organization, limited equity tenant cooperative, public agency, or other entity acceptable to the Secretary." ELIHPA § 224(b)(7) (emphasis added). In this respect, the government has not pointed to any "other provision[ ] of law" that authorized a sale option under ELIHPA.[40] And, a process for arranging for a HUD-assisted sale of a property was not specified in HUD's implementing regulations. *See* 24 C.F.R. § 248.231 (1991) (noting only that HUD would facilitate such a sale by providing an "expedited review of a request for approval of a transfer of physical assets").

There were no sales under ELIHPA in the New Orleans area. *See* PX 124a (Def.'s Resp. to Pl.'s Second Set of Interrogs. to Def.) (listing Section 236 and 221(d)(3) projects falling within jurisdiction of New Orleans HUD office that submitted plans of action for incentives or sale pursuant to EL-IHPA or LIHPRHA from February 1, 1988 through March 28, 1996).[41] But there were apparently some sales under ELIHPA in other parts of the country. *See* 2009 Tr. 95:16–21, 135:3–13 (East). Mr. East testified that in these sales, the sales prices were set by an appraisal assuming no HUD restrictions, that the owner selected the appraiser, and that although purchasers had to agree to maintain the properties as a moderate– or low-income project, HUD provided incentives in the form of loans to facilitate the sales.

2009 Tr. 90:21 to 91:21 (East). Mr. East testified that to his knowledge, all approved plans of action for sale were funded, and that all owners who sought a sale were able to find buyers. 2009 Tr. 92:25 to 93:10, 95:24 to 96:9 (East).

CCA contends that even if a sale option existed under ELIHPA, it had no notice of such an option. *See* Pl.'s Br. at 31. Mr. East testified that two internal HUD memoranda from 1988 provided guidance on how to proceed with the incentives process under ELIHPA. *See* 2009 Tr. 144:4–22 (East); DX 211 (Mem. from Thomas T. Demery, Assistant Secy. for Housing, HUD, to all Regional Administrators, et al. (May 20, 1988)); DX 212 (Mem. from Demery to all Regional Administrators, et al. (July 1988)). Remarkably, however, these memoranda do not even mention a sale option among the potential incentives, which the memoranda purported to set forth *in toto*. *See* DX 212 at 7–8 (Plan of Action: Review and Analyses). There is no evidence that Mr. Norman was aware that he could sell the property under ELIHPA, although he learned late in 1990 that he could sell the property under LIHPRHA. *See* 2006 Tr. 439:16 to 440:5 (Norman) (testifying that as of December 1990 he was aware he could have sold the property through the preservation process); PX 41 at 1 (Mr. Norman's notes following a conversation with Ms. Andrea Lockitt, a representative of the HUD-insured mortgagee, about the new statute, LIHPRHA, "address[ing] the prepayment situation in a slightly different fashion" and providing a sale option (Nov. 6, 1990)).[42]

The pertinent question thus becomes whether the statute and regulations provided CCA and others who were similarly situated with legal notice of a sale option under EL-IHPA. *See, e.g., Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92

---

**40.** The Housing Act provided a limited sale option for a sale to a lower-income home purchaser or to a nonprofit organization or to a public body or agency for subsequent resale to lower-income home purchasers. *See* 12 U.S.C. §§ 1715l(i), (j), 1715z(i), (j).

**41.** Four sales did occur under LIHPRHA in 1996 and 1997, by one seller to affiliates of one nonprofit entity. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.).

**42.** Thereafter, on December 28, 1990, CCA filed a notice of intent under ELIHPA requesting incentives to maintain the property as a low-income project or alternatively sell the property to a non-profit entity. PX 42 (Notice of Intent (Dec. 28, 1990)). The notice of intent specifies that it requests the changes under either ELIHPA or the then-recently-enacted LIHPRHA. *Id.* at 3.

L.Ed. 10 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."); *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1373 (Fed.Cir. 2002) (same). Apart from the fact that EL-IHPA states that the facilitation of a sale must be "authorized in other provisions of law," § 224(b)(7), and there is no evident source of such other authorizing law, ELIH-PA and HUD's regulations do not outline a procedure for facilitating a sale. That some owners, working with HUD, negotiated and completed sales, *see* 2009 Tr. 90:21 to 91:21 (East), does not cure the lack of guidance in the statute and regulations, and it does not put CCA on sufficient legal notice that it could have attempted a sale to seek to obtain fair market value for Chateau Cleary under ELIHPA.

HUD also was not able to provide assurance that it would fund incentives for a sale. As Mr. East testified, to induce and enable a buyer to purchase a property at its restriction-free value, yet agree to maintain the property as a low-income housing project, HUD had to provide financial incentives to the buyers, and those financial incentives were funded through Congressional appropriations. 2009 Tr. 92:25 to 93:6 (East). The regulations specified that cost was a factor, as HUD was directed to only approve incentives that constituted "the least costly alternative for the Federal Government to achieve the purposes" of ELIHPA. 24 C.F.R. § 248.233(c) (1991). Mr. East testified that funding was not a problem between 1990 and 1993 for the sales of which he was aware. *See* 2009 Tr. 93:7–10 (East). Although Chateau Cleary's market value in 1992 is unknown, Chateau Cleary was appraised at $2,300,000 absent HUD restrictions in 1996. PX 74 (Mem. from Ernest Norman, III to John Sibal, Vice President, Eustis Mortgage Corporation (Nov. 26, 1996)). The property was located in a neighborhood that had seen considerable growth of a desirable nature, making it a prime market rental property. *CCA Assocs.*, 75 Fed.Cl. at 193. It is reasonable to assume that a purchaser would have required considerable financial incentives before agreeing to pay the market price for a property that would need to remain low-income housing for close to twenty years. Mr. East testified that at least between 1990 and 1993 money would have been available had CCA diligently pursued a sale. 2009 Tr. 93:11–15 (East). However, starting in 1995, funding became an issue, 2009 Tr. 152:14–25 (East), and three properties in the New Orleans area that qualified for incentives were denied for lack of funding. *See* PX 124a at 2 (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.).

Another assumption upon which the government relies in its economic calculation is that CCA could have found a buyer for Chateau Cleary. *See* Def.'s Br. at 33. In support of this contention, the government points to three pieces of evidence. First, Mr. East testified that he was unaware of any owner pursuing the sale option who was unable to find a buyer. *See* 2009 Tr. 93, 95–96, 139 (East). Second, four properties in New Orleans were sold by a particular seller to affiliates of a nonprofit organization through HUD-facilitated sales. *See* PX 124a at 3 (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.); 2009 Tr. 94:2–20 (East). And third, an unidentified non-profit buyer expressed interest in purchasing Chateau Cleary. *See* 2006 Tr. 379:4 to 380:10 (Norman); DX 124 (Letter from Andrea Lockitt, Vice President, Hunton Hastings, Inc., to Earnest Norman, Jr. (Nov. 26, 1990) (raising the possibility of purchasing Chateau Cleary)).

The first item raised by the government provides little utility for this analysis as it concerns areas of the country other than the New Orleans market. Mr. East's testimony also relates only to owners who actively pursued the sale option at an early stage. The second item turns on the fact that affiliates of one purchaser came forward and bought properties in the New Orleans area. However, as discussed *infra*, those purchases took place in 1996 and 1997 under LIHPRHA, and are therefore not particularly helpful in determining whether a buyer would have been available around 1992 when the government contends CCA would have been able to sell the property. The third item focuses on the

fact that Mr. Norman discussed the LIH-PRHA sale option with Andrea Lockitt, a representative of the company servicing CCA's HUD-insured mortgage. 2006 Tr. 371–76 (Norman). Ms. Lockitt indicated that the mortgage-servicer had aligned with a non-profit buyer that was potentially interested in purchasing Chateau Cleary. *See* PX 41. However, the record neither reveals the name of the non-profit entity nor its financial circumstances. Based upon this evidence, it is possible that a potential buyer for Chateau Cleary could have been identified particularly in 1991 or 1992, but that possibility is uncertain. The most salient fact is that no sales occurred under ELIHPA in the New Orleans area, which meant that no sales occurred there during the period assumed by Dr. Dickey.

In sum, the possibility of a sale option under ELIHPA cannot be used to offset the economic impact of the preservation statutes because it is too speculative. ELIHPA and its implementing regulations lack any defined procedures, standards, or guidelines for effecting such a sale. They fail to put the property owner on notice of such a sale option. The absence of any defined sale process under ELIHPA also meant there was no assurance that the property owner would receive fair market value. In addition, there is uncertainty as to whether HUD would have had funding for such a sale and whether CCA could have found a willing and qualified buyer. Therefore, the assumption that CCA could have completed a sale by November 1992 if it had diligently pursued one is unsupported.

There is no question that LIHPRHA contained a sale option. *See* 12 U.S.C. § 4110; 24 C.F.R. § 248.133 (1993). Both LIHPRHA and the implementing regulations set forth a detailed sale or transfer procedure.[43] And the evidence indicates that sales took place under LIHPRHA, including four in the New Orleans area. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.); 2009 Tr. 93:20 to 95:6 (East). However, owners seeking to sell under LIHPRHA could not commence the sale process until April 1992. *See* 2009 Tr. 116:5–8 (East) (stating that HUD could not receive notices of intent until regulations and appraisal guidelines pertinent to LIHPRHA were put in place). For the four properties sold under LIHPRHA in the New Orleans area, the owner of those properties filed notices of intent in May 1994, and the sales were completed between September 1996 and February 1997, indicating that the total sales process under LIHPRHA could be accomplished within two years and four months and two years and nine months. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.). Mr. East testified that this time frame exceeded what was typical in his experience when he was working for HUD. *See* 2009 Tr. 147:16 to 149:25 (East). But he also acknowledged that any issues arising with a seller or buyer could delay or derail the process. *See id.* HUD provided a general estimate of 41 months (three years and five months) to complete the sale process. *See* PX 201 at Appendix 1–1C.

A shortfall in funding for incentives under LIHPRHA also occurred. Three properties in the New Orleans area sought incentives under LIHPRHA and were approved by HUD, but could not be implemented because HUD lacked the requisite funding. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.). Mr. East testified that up until 1994, funding was readily available, but that "funding did become an issue in

---

**43.** The process in LIHPRHA of seeking to prepay or obtain incentives was similar to that in ELIHPA, but differed in material respects. For instance, under LIHPRHA both HUD and the owners would obtain appraisals of the fair market value of the property. 12 U.S.C. § 4103(b)(2); 24 C.F.R. § 248.111. The purchaser had to agree to retain the property under the low-income housing restrictions for the useful life of the property. 12 U.S.C. § 4121(a). To proceed with a sale required the filing of a second notice of intent, 12 U.S.C. § 4110(b)(1); 24 C.F.R. § 248.133, after which the owner was required to keep the offer to sell open for a fifteen-month period. 12 U.S.C. § 4110(b)(1). If no qualified purchaser came forward in that time period, the owner was permitted to prepay the mortgage and thereby terminate the low-income affordability restrictions. 24 C.F.R. § 248.169(a)(4). However, the prepaying owner was not allowed to raise rents for an additional three years for any tenants who were residents of the property when the owner originally filed its notice of intent. 12 U.S.C. §§ 4113(c)(1), 4114(a); 24 C.F.R. § 248.165.

1995, 1996, and 1997." 2009 Tr. 152:14–25 (East).

And the likelihood of a sale under LIH-PRHA, as with ELIHPA, depended upon a ready and willing buyer. As discussed *supra,* there was no reasonable certainty that a buyer would be available. The court lacks sufficient evidence to determine whether the indirect expression of interest in purchasing Chateau Cleary, conveyed through a representative of CCA's HUD-insured lender, reflected an entity that would have been able and willing to purchase the property. All of the four sales that took place in the New Orleans area occurred in 1996 and 1997 and involved buyers that were affiliates of one entity. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.); 2009 Tr. 93:20 to 94:20 (East).

 It is conceptually possible within the statutory and regulatory framework of LIH-PRHA that CCA, had it filed a notice of intent in 1992, could have found a buyer and obtained the necessary approval from HUD to complete a sale before funding began to dry up, or alternatively prepaid the mortgage in the event that a buyer did not appear, and been subject to the three-year restriction on raising rents. However, the court must consider facts as they existed in New Orleans at the time, not merely what the regulations indicate was possible. The facts indicate that there was one owner of four properties who successfully pursued the sale option under LIHPRHA, with sales to affiliates of one entity, *see* 2009 Tr. 94:2–20 (East), and that the earliest that owner was able to accomplish a sale was in September 1996. *See* PX 124a (Def.'s Resps. to Pl.'s Second Set of Interrogs. to Def.). That CCA might have been able to realize a fair-market sale under LIHPRHA before September 1996 is too speculative to offset the economic loss imposed on CCA by the prepayment restrictions.

In conclusion, the preservation statutes restricted CCA's ability to prepay its mortgage and thereby free itself of the housing restrictions and realize its full market-based earning potential and thus value. While Congress sought to provide offsetting benefits to ameliorate this restriction, the evidence that a sales option or other incentive could have been used by CCA prior to September 1996 is too speculative to establish an offset in this case. Therefore, this court finds that CCA suffered an economic impact of 18 percent to its market value as a result of the temporary restrictions in place under the preservation statutes even considering potentially available statutory benefits. *See* Joint Stipulation of Facts at ¶ 4 (July 14, 2009).

### 5. Takings Synopsis.

Having examined each of the *Penn Central* factors, the ultimate question becomes whether the statutory restriction on prepayment in this case went too far by forcing CCA and other property owners within the HUD programs to bear alone the burden of providing housing for low-income populations "which, in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563; *see Pennsylvania Coal,* 260 U.S. at 415, 43 S.Ct. 158. "The preservation statutes [had] the character of a taking in that they disproportionately placed the burden of providing low-income housing on owners of Section 221(d)(3) properties, such as CCA." *CCA Assocs.,* 75 Fed.Cl. at 199. CCA also had reasonable, investment-backed expectations that were frustrated by ELIHPA and LIHPRHA. For CCA, the ability to prepay their mortgage after 20 years was both the "but-for" and the primary investment expectation. Other benefits, such as annual distributions and tax benefits, may have been significant for investors in different circumstances; but for CCA and others who built similar projects in areas that were developing or improving, the other benefits were secondary, peripheral reasons for their investment. Chateau Cleary was ideally located in the path of future development, positioning it for conversion to a market-rate conventional apartment complex.

As a result of the temporary taking, and considering the entire, whole, useful life of Chateau Cleary, CCA suffered an 18% economic loss in its total market value. In determining how far is too far, there is "no magic number," *Rose Acre Farms,* 559 F.3d at 1282, and "no set formula." *Cienega X,* 503 F.3d at 1278. Here, an 18% economic

loss concentrated over approximately five years constitutes a "serious financial loss." *Loveladies Harbor*, 28 F.3d at 1177. The duration of the deprivation, five years and ten days, is significant in this regard. Although there is no magic number for duration, just as there is none for economic loss, *see Tahoe–Sierra*, 535 U.S. at 342, 122 S.Ct. 1465 (in a temporary regulatory takings case, "the duration of the restriction is one of the important factors that a court must consider," but rejecting a six-year *per se* takings rule), the five-year period of restriction is definitely greater than the more-than-one-year duration that the Supreme Court in *Tahoe–Sierra* said "should be viewed with special skepticism." *Id.* at 341, 122 S.Ct. 1465. The Supreme Court in *Tahoe–Sierra* addressed a 32–month moratorium and held that the *Lucas* categorical-taking rule did not apply. Nonetheless, it commented that if plaintiffs had sought relief on a non-categorical-taking claim related to individual parcels, "some of them might have prevailed on a *Penn Central* analysis." *Id.* at 334, 122 S.Ct. 1465. That observation applies to this case. The economic loss suffered here, when combined with the character of the government's actions and CCA's reasonable investment-backed expectations, which both factor heavily in CCA's favor, is sufficient to establish that CCA suffered a temporary regulatory taking.[44]

## C. Just Compensation

■ Just compensation "means the full and perfect equivalent in money of the property taken. The owner is to be put in as good [a] position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S.

369, 373, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *see also Monongahela Navigation Co. v. United States*, 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463 (1893) (there is "no doubt that the compensation must be a full and perfect equivalent for the property taken"); *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed.Cir.1992) ("The Fifth Amendment guarantees a property owner the right to seek damages for the full extent of a taking.").

This court's prior judgment was vacated and remanded for further consideration in accordance with *Cienega X, see CCA Assocs.*, 284 Fed.Appx. at 811, and included no instructions regarding just compensation, except that the decision in *Cienega X* noted that offsetting benefits are pertinent to the analysis. *See Cienega X*, 503 F.3d at 1284 n. 14.[45] This court previously held that "[t]he proper measure of damages for a temporary taking of a going business concern [is] the difference between the fair market rent the owner could have earned, but for the taking, and the rent, if any, the owner earned during the takings period." *CCA Assocs.*, 75 Fed. Cl. at 200 (citing *Kimball Laundry*, 338 U.S. at 7, 69 S.Ct. 1434 ("the proper measure of compensation is the rental that probably could have been obtained [but for the taking].")); *United States v. Petty Motor*, 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (just compensation is measured by "the difference between the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew ... less the agreed rent which the tenant would pay for such use and occupancy."); *see also United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70

---

**44.** The *Rose Acre Farms* case is instructive in how economic loss must be considered in light of the other *Penn Central* factors in a temporary regulatory takings case. In that case, over a twenty-five month period, the plaintiff suffered a 10% loss in value to 43% of its eggs. *Rose Acre Farms*, 559 F.3d at 1264, 1283. This economic impact was considered "not severe" by the Federal Circuit. *Id.* at 1283. And while reasonable investment-backed expectations favored the plaintiff, the character of the government's regulations strongly favored a non-taking. *Id.* On balance, therefore, the Federal Circuit viewed

the factors as requiring a holding of no compensable taking. *Id.*

**45.** As explained *supra* at 613–18, the availability of a sale option to CCA during the time of the temporary taking is too speculative to offset economic losses or, in this case, reduce just compensation. Other potential benefits, such as those available with use agreements to extend the life of low-income use, were not addressed at trial. Accordingly, just compensation will not be offset by any potential offsetting benefits CCA might have opted to receive under the preservation statutes.

S.Ct. 547, 94 L.Ed. 707 (1950) ("This Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases.")); *Pewee Coal,* 341 U.S. at 117, 71 S.Ct. 670 ("Ordinarily, fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use," but the better measure on the facts of that case was the operating losses suffered during the temporary period of governmental control.). This court previously rejected the government's contention, renewed here (*see* Def.'s Br. at 49–50), that compensation should be calculated as of the start of the alleged takings period. *See CCA Assocs.,* 75 Fed.Cl. at 202 (rejecting this contention because it is derived from permanent taking cases, and explaining that in a temporary taking case, the time of the taking is the full period during which governmental action constrained the owner's property rights).[46]

 As this court's prior methodology was implicitly approved by the Federal Circuit in *Independence Park Aparts.,* 449 F.3d at 1248 (holding that an owner who signed a use agreement during the takings period was entitled to just compensation for the term of the use agreement), the same analysis will be applied here, with one exception. The court adopted the model of damages developed by CCA's expert, Dr. Ragas, who calculated "the difference between the cash flow CCA would have received had it been allowed to prepay its mortgage and operate the property as a conventional apartment complex … and the cash flow CCA actually received from operating the property as a HUD-restricted property." *CCA Assocs.,* 75 Fed.Cl. at 200. Dr. Ragas's calculations assumed a takings period from January 1991 to February 1997. However, as explained *supra,* at 603 n. 24, the Federal Circuit has concluded that the period of restriction attributable to HUD's post-HOPE preservation letters should be disregarded, and thus the takings period only extends to the enactment of HOPE, plus the 60–day restriction on rent

increases—that is, until May 27, 1996. Accordingly, the total estimated foregone net rental income for Chateau Cleary apartments suffered by CCA Associates from May 1991 to May 1996 was $714,430. *See* PX 106 at 47–48 (Second Ragas Report); *compare CCA Assocs.,* 75 Fed.Cl. at 204. Further, CCA is entitled to compound interest at the ten-year Treasury STRIPS rate. *See CCA Assocs.,* 75 Fed.Cl. at 205.

## CONCLUSION

For the reasons stated, the court is bound by precedent established by the decision in *Cienega IV* to conclude that the government was not in privity with CCA in regards to CCA's contractual right to prepay its mortgage after twenty years. The government therefore is not liable on CCA's breach-of-contract claim. However, the court finds that CCA has suffered a temporary taking for which just compensation is due. The amount of just compensation awarded CCA is $714,430 as of the end of the temporary takings period, May 27, 1996, plus compound interest at the ten-year STRIPS rate from that date to the date the judgment is actually paid.

Final judgment to this effect shall be issued under RCFC 54(b) because there is no just reason for delay. In due course, the court will also award costs to plaintiff, including an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c). Given the high likelihood of appeal in this case and in the interest of efficiency, proceedings on award of attorneys' fees and costs should be deferred until after any appellate process has been concluded.

The clerk shall enter final judgment as specified above.

It is so ORDERED.

---

**46.** As the court explained previously, the government's proposed just compensation model is not a true *ex ante* approach because, while it purports to calculate different valuations as of May 1, 1991, it assumes that reasonable investors would know with certainty that HOPE would be enacted in 1996. *See CCA Assocs.,* 75 Fed.Cl. at 202 n. 43. A proper *ex ante* analysis should be based only on the facts and circumstances known at the time of the start of the taking. *Id.*